## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **RYAN MOORE**<br>**12650 Granite Ridge Drive**<br>**North Potomac, MD 20878**<br><br>v.<br><br>**CARLA HAYDEN, in her capacity as**<br>**Librarian of Congress**<br>**101 Independence Avenue SE**<br>**Washington, D.C. 20540** | )<br>)<br>)<br>)<br>)    **Civil Action No.**<br>)<br>)<br>)<br>)<br>)    **Jury Trial Demanded**<br>)<br>) |

## COMPLAINT

Plaintiff brings this suit because the Library of Congress, through its supervisory personnel, denied discriminated and retaliated against him by rejecting him for a promotion to a position as Head of the Reading Room for which he was imminently qualified and denying and blocking professional endeavors in such a way as to adversely impact Mr. Moore's career at the Library.

### I. JURISDICTION AND VENUE

1. At all times relevant to this complaint, Plaintiff has been a full-time employee of the Library of Congress.

2. Defendant is the Librarian of Congress, the head of the Library of Congress, which is an agency of the U.S. Government.

3. This civil action is brought pursuant to the Congressional Accountability Act, 2 U.S.C. § 1301, *et seq*. and, specifically 2 U.S.C. §1302 (a)(3), which adopts the Americans With Disabilities Act (ADA), as amended, specifically, 42 U.S.C. § 12112 (prohibiting discrimination on the basis of disability), as well as 2 U.S.C. § 1317 (prohibiting retaliation because the employee has opposed any practice made unlawful by the CAA or has made a

complaint under the Act.

4. This Court has jurisdiction pursuant to 28 U.S.C. 1331 (Federal Question) and 42 U.S.C. 2000e-5.

5. Venue for this Civil Action is appropriate in the U.S. District Court for the District of Columbia pursuant to 28 U.S.C. 1391 and 2 U.S.C. § 1408, because all of the unlawful employment actions at issue in this civil action occurred in the District of Columbia.

6. Plaintiff has exhausted his administrative remedies in this case by: (1) filing a request for counseling with the Office of Compliance on •, as required by 2 U.S.C. §§1402 and 1408(a), on August 7, 20178; requesting mediation as required by 2 U.S.C. §§1403 and 1408(a), on September 10, 2018; and participating in a mediation during that period.

7. This civil action is filed after the 30-day cooling off period mandated by 2 U.S.C. §1404(b) and before the expiration of 90 days following the end of mediation.

## II. FACTS

### FACTS RELATED TO FIRST COMPLAINT, CIVIL ACTION 1:18-cv-00481-RC

8. Prior to October 2017, the Plaintiff, Ryan Moore, was a GS-13 Cartographic Specialist in the Office of the Chief, in the Geography and Map Division of the Library of Congress, in the Library Services, Geography and Map Division. Mr. Moore had been in the same position in since 2015.

9. Between 2008 and 2015, Mr. Moore had been a Technical Information Specialist in the Geography and Map Division.

10. Plaintiff is a qualified person with a disability. He suffers from Congenital Primary Bilateral Lymphedema (also known as Milroy's Disease). Lymphedema is a genetic developmental disorder affecting the lymphatic system. The disease is characterized by

swelling (edema) of the lower legs and feet and hardening of the skin.  As a result of the disorder, Mr. Moore is required to avoid long periods of immobility and standing and should perform certain exercises and stretches regularly.

11. Because of Plaintiff's disability, the combination of standing, walking, kneeling, climbing, carrying and lifting caused him in debilitating pain and fatigue.

12. Mr. Moore was able to perform the essential functions of his position with accommodations, which had been in place since approximately 2010 after having been approved by a previous manager. These accommodations included two days a week of telework, dimming of lights over his desk, a private office that allowed him to perform exercises and stretches without embarrassment, and the use of a stool to elevate his legs when he sat at his desk.

13. Paulette Hasier became the Chief of the Geography and Maps Division in late January or early February 2017.

14. Michael Buscher was the Team Leader for the Reading Room in the Geography and Maps Division at all times relevant to this complaint.

15. Mark Sweeney was the Associate Librarian over Library Services and is now the Deputy Librarian of Congress.

16. On February 2, 2017, Mr. Moore, wrote an email to Paulette Hasier, the Chief of the Geography and Map Division (his first line supervisor) indicating that he wanted to work with her to eliminate a hostile working environment caused because African American and Asian employees were being subjected to racist remarks, which were harmful to the entire workplace environment.  Ms. Hasier reacted angrily to the email and told Mr. Moore that she believed he was trying to damage her professionally.

17. On February 16, 2017, two weeks after Mr. Moore advised Ms. Hasier of the potential hostile working environment against African -American and Asian-American employees, Ms. Hasier placed Mr. Moore on a detail to the Reading Room and terminated his ability to use telework.

18. During the February 16, 2017 meeting in which Ms. Hasier told Mr. Moore that he was being detailed away from his Cartographic Specialist position, Plaintiff explained that – although he was willing to help as needed, including covering the Reference Desk – he could not accept the detail to the Reading Room because the detail conflicted with the accommodations under which he had been working. Ms. Hasier responded by telling Plaintiff: "get ready to change your life."

19. Shortly after the February 16, 2017 meeting, Mr. Moore advised Ms. Hasier that he was going to take sick leave the following day due to anxiety and stress caused by the threat to detail him to the Reference Desk and to remove his accommodations. In response, Ms. Hasier threatened to list Plaintiff as AWOL if he did not appear at work.

20. Mr. Moore contacted an EEO representative to complain about the denied accommodation, retaliation and hostile work environment on February 21, 2017.

21. Plaintiff filed a formal request for accommodation on February 24, 2017 requesting, among other things, that he be permitted to telework two days a week, that he be permitted to keep his feet elevated, that he not be required to stand for prolonged periods, walk for extended periods or to crouch, and that the lights be dimmed in his workspace.

22. On several occasions in February 2017, Plaintiff asked Ms. Hasier and Mr. Buscher about his accommodation request and provided them with documentation supporting his accommodation request, but Mr. Buscher told him that he was not going to get involved.

On February 21, 2017 Ms. Hasier instructed Mr. Moore not to correspond any further with Mr. Buscher about the accommodation request.

23. Mr. Buscher sent Plaintiff an email on the morning of March 6, 2017 informing him that continued use of telework would be considered misconduct subject to discipline and that Mr. Moore would be charged with AWOL, which was also subject to discipline.

24. Mark Sweeney denied Plaintiff's formal accommodation request the accommodation request on the evening of March 6, 2017.

25. In the March 6, 2017 email in which Mr. Sweeney denied the accommodation, Sweeney stated that the detail to the Geography and Maps Reading Room would be implemented, effective immediately, and that he would thereafter be reporting to Mr. Buscher.

26. Mr. Moore's attorney contacted the Office of General Counsel in an attempt to secure Plaintiff's requested accommodations on several occasions between March 7 and March 10, 2017.

27. On March 10, 2017 the Office of General Counsel declared that neither Mr. Moore's permanent position as Cartographic Specialist, nor the detail to the Reading Room lent themselves to Telework, even though no workplace analysis had been conducted at that time.

28. Under the detail to the Reading Room, Plaintiff was required to work one day each week on the Reference Desk and to serve as a relief Librarian on the Reference Desk a second day each week.  In addition, Plaintiff was required to continue to fulfill all of his duties in his former Cartographic Specialist position.

29. There was no need to detail the Plaintiff to the Reading Room position (and thereby eliminate his accommodations) because numerous other qualified Librarians were

available and interested in the detail.

30. A primary problem of the Reading Room detail was that it did not permit Plaintiff to continue to use his telework accommodation because he had to be physically present at the Reference Desk two days each week.

31. Additionally, unlike other employees assigned to the Reading Room, Mr. Moore was assigned to fix shifts from 9:30 to 5:00pm. The other employees in the Reading Room were permitted to work flex schedules.

32. The LOC claimed that not only did the detail not permit telework, but that Mr. Moore's regular position (Collections Specialist in the Geography and Map Division) did not permit telework, despite the fact that Mr. Moore had been using the telework option for the prior 10 years, and had received Outstanding Performance Evaluations since 2011, while using the Telework option.

33. On March 16, 2017, the Defendant's Equal Employment Opportunity and Diversity Programs Office (EEO) informed Mr. Moore that informal attempts to secure his accommodations were unsuccessful.

34. Mr. Moore filed a formal EEO complaint of disability discrimination and retaliation on March 16, 2017.

35. Even though Plaintiff had initiated the discussion about his need for an accommodation on February 16, 2017 and filed the informal complaint of discrimination (which involved an attempt at resolution in early March), Ms. Hasier did not engage in the "interactive process" until April 7, 2017. During a meeting on that day, Ms. Hasier demanded that Mr. Moore provide a detailed account of all of the work he had performed under the telework accommodation for every day of the fourth quarter of calendar year 2016. That was an

impossible challenge because Mr. Moore had not been required to keep such granular time accounting at that time.

36. Immediately after the April 7, 2017 meeting, in order to further undermine Mr. Moore's accommodation request for telework, Ms. Hasier added an additional day of Reference Desk coverage.

37. On April 11, 2017, Ms. Hasier formally denied Plaintiff's medical telework request, claiming that there was not enough substantive work for him to perform even one day a week.

38. On April 18, 2017, Plaintiff appealed Ms. Hasier's accommodation denial to Mark Sweeney, the Associate Librarian for Library Services.

39. On May 16, 2017, Mr. Sweeney denied Plaintiff's appeal. But at the same time, Sweeney permitted Plaintiff to telework one day per week "on a trial basis."  Mr. Moore had previously been permitted to work two days a week on telework, so the one-day reduction was significant and adverse.

40. Consistent with the pattern of punishing Plaintiff each time he asserted his right not to be discriminated against, the LOC retaliated against Plaintiff for appealing Hasier's denial.  In the same May 16, 2017 letter in which he denied Plaintiff's appeal, Mr. Sweeney also permanently transferred Plaintiff from the Office of the Chief, to the Reading Room, so that Plaintiff would no longer report directly to Ms. Hasier and he would permanently report to Mr. Buscher.

41. Mr. Moore amended his formal complaint of discrimination and retaliation to include the permanent reassignment on May 24, 2017 and that amendment was accepted on May 31, 2017.

42. The Defendant issued a preliminary decision rejecting Plaintiff's claims for discrimination and retaliation on October 17, 2017.

43. Mr. Moore was not satisfied with the initial determination and asked for a Final Agency Decision by the Librarian on November 3, 2017.

44. The Defendant issued its Final Agency decision on December 4, 2017, concluding that there was "no evidence" of discrimination, retaliation or hostile work environment.

45. On December 20, 2017, Defendant announced an opportunity for a temporary promotion or detail opportunity to the GS 14 level, to serve as the Team Lead of Reference and Reader Services in the Geography and Map Division.

46. Mr. Moore was qualified for the position and he timely applied. Additionally, Mr. Buscher recommended Plaintiff to Ms. Hasier.

47. Ms. Hasier did not interview Plaintiff, and she selected another candidate on January 31, 2018.

48. The selectee for the Temporary Promotion is not disabled and has never engaged in protected activity against Ms. Hasier or the Library of Congress.

49. On or about January 8, 2018, Ms. Hasier removed important duties from Plaintiff, including drafting "Collections Guides," both electronic and in print, which had been part of Plaintiff's job description for years.

50. Additionally, on or about January 8, 2018 Ms. Hasier eliminated the prestigious Phillips Map Society Occasional Papers, to which Plaintiff contributed papers and also managed. This was a prestigious assignment for Plaintiff and no reason was given for its discontinuance.

51. The collections guides and Phillips Society assignments were two of the principal functions

that Plaintiff performed on his once-weekly telework days.  They are also unique, high visibility and prestigious assignments, which made Plaintiff more attractive as a candidate for promotion to higher levels.

52. In late January/early February 2018, Mr. Moore had an opportunity of a prestigious speaking opportunity for the Rocky Mountain Map Society, in Denver Colorado, where he would have discussed the LOC's Map Collections. Plaintiff had to decline the invitation because – even though the Rocky Mountain Map Society offered to pay Plaintiff's air fare, hotel and meals, Ms. Hasier would only approve Administrative leave if Mr. Moore came to work at the LOC first, then took the flight to Denver from work, then teleworked on the flight returning from Denver after the event.  These were unusual demands for such an engagement and made the trip too demanding for Mr. Moore to accept.  Consequently, Mr. Moore was forced to decline the invitation.   Speaking engagements of this nature are impressive accomplishments that give candidates competitive advantages for selections.

**FACTS SUPPORTING THE CURRENT CIVIL ACTION**

53. Plaintiff repeats all of the above paragraphs as if they were specifically restated here.

54. On numerous occasions, Mr. Moore and Ms. Hasier have encountered each other in public, particularly on the Metro, either in a train or on the platform. On those occasions, Mr. Moore has waved in greeting to Ms. Hasier.  Hasier, however, has either ignored Mr. Moore or has exited the train and boarded an adjacent train to continue her ride away from Mr. Moore.

55. After Ms. Hasier eliminated the Phillips Maps Society Occasional Papers program, Mr. Moore was able to complete on final Phillips Maps Society Paper in 2018, but only because it had been approved by Mr. Buscher before he retired in January 2018.  This paper was

completed under unusual circumstances that also illustrate Hasier's unlawful animus. Although Mr. Moore previously had three writers lined up for papers, because no funding was allowed, with which Mr. Moore could have paid a writer's stipend, Mr. Moore had to use an old publication from 1978, for which he (working with an intern) provided updates. In June 2018, Mr. Moore explained to Hasier the probable deadlines for completion and requested 200 copies be printed.  Notwithstanding that conversation, on August 24, 2018 Jennifer Somosky (Ms. Hasier's assistant) emailed Plaintiff at Hasier's behest declaring that he had to submit the paper that same day if he wanted to have it printed.  Because there was insufficient time, the paper was only published electronically, which is must less prestigious. In October 2018, Mr. Moore was informed that the paper had been printed. Mr. Moore was not shown the proof of the publication before it went to the printer, which is outside the normal course of business. To date, Mr. Moore has not been shown the printed copy.

56. Following the departure of the Stephanie Stillo, who was selected for the temporary promotion in January 2018, Rene Sayles became the Acting Team Lead of the Reading Room and Mr. Moore's first line supervisor.

57. Ms. Sayles has continued Ms. Hasier's hostile conduct toward Mr. Moore.  Among other things, Ms. Sayles has assessed informal disciplinary warnings against him. For example, in August 2018 when Mr. Moore, and others, asked for information about the selection process for permanently filling the Reading Room Chief position, Ms. Sayles falsely claimed that Mr. Moore had been rude, and she gave him what she called a "verbal warning" about his conduct.

58. Additionally, Ms. Sayles has counseled Mr. Moore because she cannot read his signature

on the sheets the Reading Room employees use to clock in and out in the morning and evening.  Mr. Moore explained that he uses the same signature he has used for years, and he asked if Ms. Sayles would prefer that he use script.  Ms. Sayles responded that Mr. Moore was not permitted to sign in script, and that it had to be a signature, yet she maintained her objection and counseled him on his signature, placing Mr. Moore in fear of discipline for simply signing in and out each day.

59. Ms. Sayles ultimately accepted Mr. Moore's explanation via email on August 23, 2018. However, the same issue was raised via by Kathy Hart, the new Head of the Reading Room, on October 26, when Ms. Hart told Mr. Moore, "I hear you have a handwriting problem." Mr. Moore explained the matter and informed Ms. Hart that Rene Sayles had the same discussion with him in August.  Mr. Moore stated that he thought that matter was resolved. Mr. Moore stated that if Ms. Hart could not read is handwriting on the sign-in sheet that he be permitted to utilize two spaces or in alternative the spaces be made larger. Ms. Hart twice emailed Mr. Moore on October 30 threatening him with discipline should he not provide what she considered to be a legible signature. When Mr. Moore repeated his request for a simple accommodation, Ms. Hart ordered Mr. Moore to sign in and out via email.  Mr. Moore called Ms. Hart to discuss the dynamics of the process, specifically how to address network outages and boot up time on the computers in the morning, which are often protracted.  Ms. Hart declined to speak with him.   Mr. Moore has continued to sign in via email and has had to document his arrival with photographs, as there have been frequent network problems.

60. At the end of August 2018, Mr. Moore identified a two-day detail in another division. As a condition of approving the detail, Ms. Sayles required Mr. Moore to use one of his

telework days on the detail – thereby eliminating his ability to use telework, which Mr. Moore requires for his disability.

61. In order to preserve the telework day, and the resulting health benefits, Mr. Moore had to modify the detail so that it is only one day a week.

62. In the Spring and summer of 2018, Mr. Moore Plaintiff applied for, was deemed qualified, and was interviewed for the Chief of the Geography and Map Division Reading Room.

63. Plaintiff was interviewed by, among others Paulette Hasier.

64. On or about August 7, 2018, Plaintiff learned that he had not been selected for the Reading Room Team Lead position, and that Kathy Hart, who was formerly employed at Rice University, was selected.

65. On information and belief, Mr. Moore's performance during the interviews was superior to that of Ms. Hart and he was significantly more qualified than Ms. Hart for the Reading Room Team Lead position.

66. In November 2018, Mr. Moore proposed to Ms. Hart that the Geography and Maps Division sponsor a lecture by two scholars who had extensively used the Division's historic Egypt maps for a recent paper.  Even though the lecture is a perfect fit for the Division and despite their heavy reliance on the Geography and Maps resources, Ms. Hart – in furtherance of the hostile work environment – declined the opportunity and advised Mr. Moore to refer the scholars to the Africa and Middle East Division, with whom they did not collaborate for the paper.  Subsequently, the Africa and Middle East Division asked if the Maps and Geography division would be co-sponsoring the lecture, but when Mr. Moore asked that question of Ms. Hart, she angrily replied that she had already told him "no," indicating that the question was insubordinate.   The Africa Middle East Division

corresponded with Mr. Moore on November 7, 2018 and stated that they could not host the event, thus the opportunity for an important and prestigious presentation was lost.

67. The lecture would have been a benefit to Mr. Moore, in terms of visibility and career-enhancement, as Mr. Moore was an important help to the scholars, and the scholars have acknowledged Mr. Moore's help in their paper.

## III. FIRST COUNT: DISABILITY DISCRIMINATION

68. Plaintiff repeats all of the above paragraphs as if they were specifically restated here.

69. In addition to his claims asserted in Civil Action 1:18-cv-00481-RC:

   a. Defendant rejected him for the promotion to Reading Room Team Lead in August 2018; and

   b. Defendant forced Mr. Moore to modify his detail opportunity to only one day a week in order to preserve his telework day, which is crucial to Mr. Moore's physical health. made unwarranted changes to Mr. Moore's duties and assignments in order to make it impossible for him to maintain his prior accommodations.

70. As a result of the Defendant's disability discrimination against Plaintiff, Plaintiff has suffered stress, anxiety, physical discomfort, embarrassment and humiliation, lost income, reduced promotion potential, and emotional pain and suffering.

## IV. SECOND COUNT: RETALIATION

71. Plaintiff repeats all of the above paragraphs as if they were specifically restated here.

72. In retaliation for Plaintiff's protected activity Defendant:

73. In addition to his claims asserted in Civil Action 1:18-cv-00481-RC:

   a. Defendant rejected him for the promotion to Reading Room Team Lead in August 2018;

b.  Defendant forced Mr. Moore to modify his detail opportunity to only one day a week in order to preserve his telework day, which is crucial to Mr. Moore's physical health;

c.  Issued informal discipline and accused Mr. Moore of insubordination; and

d.  Rejected Mr. Moore's proposal to sponsor a lecture relating to the Division's Egypt Map collection.

74. As a result of the Defendant's retaliation against Plaintiff, Plaintiff has suffered stress, anxiety, physical discomfort, embarrassment and humiliation, reduced promotion potential, lost income, and emotional pain and suffering.

## V. THIRD COUNT: HOSTILE WORK ENVIRONMENT

75. Plaintiff repeats all of the above paragraphs as if they were specifically restated here.

76. Because of disability discrimination and/or retaliation for Plaintiff's protected activity, in addition to his claims asserted in Civil Action 1:18-cv-00481-RC:

a.  Defendant rejected Plaintiff for the promotion to Reading Room Team Lead in August 2018;

b.  Defendant forced Mr. Moore to modify his detail opportunity to only one day a week in order to preserve his telework day, which is crucial to Mr. Moore's physical health;

c.  Issued informal discipline and accused Mr. Moore of insubordination; and

d.  Rejected Mr. Moore's proposal to sponsor a lecture relating to the Division's Egypt Map collection.

77. As a result of the hostile work environment against Plaintiff, Plaintiff has suffered stress, anxiety, physical discomfort, embarrassment and humiliation, reduced promotion

potential, lost income, and emotional pain and suffering.

## VII.  JURY DEMAND

78. Plaintiff demands a jury trial.

## VI.  PRAYER FOR RELIEF

79. Plaintiff respectfully requests that this Court: (i) declare that the employment practices
complained of in this Complaint are unlawful; (ii) permanently enjoin the Defendant and
its agents, officers and employees from engaging in all practices found by this Court to be
unlawful; (iii) order the Defendant to make the Plaintiff whole by (a) placing Plaintiff in a
GS-14 position, (c) paying Plaintiff his monetary damages and compensatory damages as
determined at trial; (iv) retain jurisdiction over this action to ensure full compliance with
the Court's orders and require the Defendant to file such reports as the Court deems
necessary to evaluate such compliance; (v) order the Defendant to pay Plaintiff's costs and
expenses and reasonable attorneys' fees in connection with this action; and (vi) grant such
other and further relief to the Plaintiff as the Court deems just and proper, including
transferring Plaintiff to a different division and supervisor to ensure against retaliation.

Respectfully Submitted,

Leslie D. Alderman III (D.C. # 477750)
ALDERMAN, DEVORSETZ & HORA, PLLC
1025 Connecticut Ave., NW, Suite 615
Washington, DC 20036
Tel: 202-969-8220
Fax: 202-969-8224
lalderman@adhlawfirm.com
Attorney for the Plaintiff