# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| RYAN MOORE, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 18-2590 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 22, 43 |
| | : | | |
| CARLA HAYDEN, | : | UNDER SEAL | |
| Librarian of Congress, | : | | |
| United States Library of Congress, | : | | |
| Defendant. | : | | |

## MEMORANDUM OPINION

### DENYING DEFENDANT'S PARTIAL MOTION FOR SUMMARY JUDGMENT; GRANTING PLAINTIFF'S MOTION FOR LEAVE TO FILE SURREPLY

## I. INTRODUCTION

Plaintiff Ryan Moore, an employee of the U.S. Library of Congress, brings this employment discrimination action against Carla Hayden, Librarian of Congress, United States Library of Congress ("the Library") alleging a failure to accommodate his recognized disability, that he was subjected to a hostile work environment, and that he was denied promotions for discriminatory and/or retaliatory reasons. Mr. Moore brings this suit under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12102, *et seq.* The Library has moved for a partial summary judgment, arguing that (1) Mr. Moore's requested accommodation was denied because it was not a reasonable accommodation supported by medical need; (2) that based on the evidence, Mr. Moore cannot establish a prima facie case of a hostile work environment; and (3) that Mr. Moore's claims of discriminatory and/or retaliatory non-selections warrant summary judgment because the Library had legitimate non-discriminatory reasons for declining to award Mr. Moore the positions in question. Because the Court has found that genuine issues of

material fact exist with regards to all three claims, the Library is not entitled to summary

judgment and this case must proceed to trial.

## II.  BACKGROUND

### A.  Mr. Moore's Employment at the Library of Congress

Mr. Moore has worked for the Library of Congress since 2007.  Def.'s Statement of Mat.

Fact as To Which There Is No Genuine Issue ("Def.'s SMF") ¶ 1, ECF No. 22.  Prior to his work

at the Library, Mr. Moore was employed as a librarian with the Cleveland Public Library.  *Id.*

Beginning in 2008, Mr. Moore was staffed as a Specialist in the Geography and Map Division,

and in 2011 became the Collections Specialist in the Office of the Chief.  Def.'s Resp. to Pl.'s

SMF ("Def.'s SMF Resp.") ¶ 2, ECF No. 40-1.[1]  In this position he was responsible for curating

the 400 different collections within the division's Special Collection, and was also the Division's

"expert" on developing finding aids.  *Id.* ¶ 5.  Mr. Moore's responsibilities also included serving

as the Executive Secretary of the Philip L. Phillips Map Society, which included acting as Editor

in Chief for the Society's quarterly newsletter and the "Occasional Papers" series.  *Id.* ¶ 7.

Mr. Moore was born with lymphedema, a chronic condition also known as Milroy's

Disease.  *Id.* ¶¶ 11–12.  This condition causes swelling in the lower limbs, hands, face and eyes.

*Id.*  Mr. Moore cannot sit without elevation of his legs or stand for extended periods of time

without "significant pain and fatigue."  *Id.* ¶ 12.  Bright overhead lighting exacerbates these

---

[1] Mr. Moore's Statement of Genuine Issues of Material Facts as To Which There Exists A Genuine Issue ("Pl.'s SMF"), ECF No. 27-1, is quite extensive, and contains a number of statements that the Library does not dispute, as evidenced by its Response to Plaintiff's Statement of Genuine Issues of Material Facts ("Def.'s SMF Resp.").  Accordingly, the Court cites to the Library's Response to indicate facts that are not in dispute.  However, because in a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 225 (1986), in recounting the background facts the Court will defer to the account of the non-movant Mr. Moore where the facts are disputed.

symptoms.  *Id.* ¶ 13.  Mr. Moore's condition has been "fairly stable" since high school.  Def.'s
SMF ¶ 17.

Beginning in 2011, Mr. Moore began teleworking pursuant to an informal agreement
with his supervisor.  *Id.* ¶ 19.  The arrangement originally called for one day of teleworking.  *Id.*
¶ 20.  At the time, Mr. Moore did not submit any medical documentation to support his
teleworking request.  *Id.*  In 2012, Mr. Moore began directly reporting to the Chief of Geography
and Maps Division, Dr. Ehrenberg.  Def.'s SMF Resp. ¶ 18.  Dr. Ehrenberg allowed Mr. Moore
to increase his teleworking time to two days a week, but as before, none of the surrounding
documentation mentioned any medical condition as being the impetus for this telework
arrangement.  *Id.*

Two years later, in 2014, Dr. Ehrenberg instigated a discussion with Mr. Moore on the
topic of whether two-days of telework per week continued to be appropriate.  *Id.* ¶ 19.  At this
time, Mr. Moore provided a medical note from his physician to the Health Services office.  *Id.*
The medical note requested two days of telework due to "stress at work due to harassment of a
fellow employee."  *Id.* (citing Def.'s Ex. 12 at LC 2738).  As a result, Mr. Moore's telework plan
remained at two-days per week.  *Id.*  Mr. Moore claims that "[w]hile on telework, [he] noticed a
dramatic improvement in his lymphedema."  Pl.'s SMF ¶ 20.

## B.  Mr. Moore's Protected Activity

On January 23, 2017, Dr. Ehrenberg was succeeded as Chief of Geography and Maps by
Dr. Paulette Hasier.  Def.'s SMF Resp. ¶ 23.  Her relationship with Mr. Moore got off to a rocky
start based on two interactions Mr. Moore now contends constitute protected activity.  First,
during the transition period prior to his retirement, Dr. Ehrenberg asked Mr. Moore to explain the
Phillips Map Society to Dr. Hasier.  *Id.* ¶ 24.  In response, Dr. Hasier allegedly stated that

"[t]hey're old. They're going away," in apparent reference to the older age of many of the members of the Society.  Pl.'s SMF ¶ 26.  Mr. Moore claims that he then informed Dr. Hasier that "at the Library of Congress, we welcome people of all ages and that the members of the Phillips Society are terrific people and that they helped us raise more than $1 million." *Id.* (citing Pl.'s Ex. 1 ("Moore Tr.") at 37:20-23).  Second, on February 2, 2017, Mr. Moore sent Dr. Hasier an email describing his belief that the Geography and Map Division had in the past allowed "persons [to be] subjected to racist remarks . . . and unless they are addressed, the division will never come close to performing at an optimal level."  Def.'s SMF Resp. ¶ 27 (citing Pl.'s Ex. 10 at LC 24).  Later that day, Mr. Moore and Dr. Hasier had a meeting during which his allegations were discussed.  *Id.* ¶ 30.  Mr. Moore contends Dr. Hasier "pounded on the table and yelled at [him]," accusing him of attempting to ruin her career and embarrass her by including another supervisor, Ms. Vicki Magnus, the head of the Library's Equal Employment Opportunity office, on the email.  Pl.'s SMF ¶ 30.

## C.  Mr. Moore's Reassignment and Accommodation Request

Following shortly after Dr. Hasier assumed her role as Chief of the Geography and Maps Department, she was informed that the Reading Room needed additional staff due to staff departures.  Def.'s SMF ¶ 11.  The Reading Room is the responsibility of the Geography and Maps Division of the Library, and includes a staffed Reference Desk of librarians that are available to answer questions from the public, physically retrieve requested items from the collections, and give tours.  *Id.* ¶ 10.  It was standard practice for a staff member to be assigned to the Reference Desk one-day per week, with another staff member assigned to cover during breaks.  *Id.* ¶ 9.  On February 16, 2017, Dr. Hasier detailed Mr. Moore for four months to the Reading Room Reference Desk, effective March 5, 2017.  *Id.* ¶ 15.  Dr. Hasier claims she made

this placement after reviewing Mr. Moore's resume and seeing that he had worked as a reference desk librarian at the Cleveland Library prior to his current employment, *id.* ¶ 13, and because his position description stated that 25% of his duties could include research and reference. *Id.* ¶ 12. The memorandum detailing his placement noted that Mr. Moore's authorization to participate in telework would necessarily end on March 6, 2017, as staff working in areas of public service such as the detail to the Reading Room are not eligible for telework. *Id.* ¶ 27. Mr. Moore attempted to tell her that the detail and end of his ability to telework would negatively impact his health—and he contends Dr. Hasier's response was, "well, get ready to change your life." Pl.'s SMF ¶ 56. The next day Mr. Moore attempted to provide more formal notice regarding the impact of this detail on his health, and emailed Dr. Hasier to inform her that he suffers "from two chronic diseases and an ergonomic-based injury." *Id.* ¶ 57. The following day he provided a note from his doctor in support of his need for telework to his immediate supervisor on the detail. *Id*. ¶ 59.

On February 21, 2017, Mr. Moore again reiterated to Dr. Hasier that the Reading Room detail "will adversely impact my health," reminded her that the Library had long provided him informal accommodations, and finally notified Dr. Hasier that he would be initiating a case with the EEOC Dispute Center. Def.'s SMF Resp. ¶ 66 (citing Pl.'s Ex. 60 at LC 1489). That same afternoon, Mr. Moore informed Dr. Hasier that he was going to take sick leave in order to visit his doctor the next day, due to the stress he was feeling from the situation surrounding the revocation of his telework accommodation. *Id.* ¶ 67. Dr. Hasier then warned him that she would mark him AWOL if he took sick leave the next day without approved FMLA leave—in Mr. Moore's account, by loudly yelling "AWOL" down the hall. Pl.'s SMF ¶ 67. As a result, Mr. Moore showed up to work the next day despite feeling unwell. *Id.* On February 21, 2017, the

Library received a letter from Mr. Moore's physician in support of his previous accommodations. Def.'s SMF Resp. ¶ 69. The letter also indicated that Mr. Moore was being harassed by a colleague, though the individual in question was not named. *Id.*

Two days later, on February 23, 2017, Mr. Moore submitted a formal request for a reasonable accommodation under the ADA. Def.'s SMF ¶ 29. Mr. Moore requested as a reasonable accommodation that he be permitted to telework on Mondays and Fridays, that he be allowed to elevate his legs, stretch, massage, and use the restroom as needed at work, and have the lights dimmed over his work area. *Id.* ¶ 30. In support of Mr. Moore's formal request, his doctor submitted a formal Accommodation Request stating that Mr. Moore's chronic lymphedema required certain specific accommodations, dated February 22, 2017. *See* Pl.'s Ex. 3 ("Feb. 22, 2017 Request for Medical Accommodation"). On March 1, 2017, Health Services issued a memorandum stating that Mr. Moore's doctor's note recommended continuing the accommodations for Mr. Moore currently in place. Pl.'s Ex. 24 ("March 1 HSO Memo") at LC 1327.

The next day, on March 2, 2017, Dr. Hasier issued Mr. Moore a disciplinary counseling memorandum. Pl.'s ¶ SMF 77; Pl.'s Ex. 61 ("March 2 Counseling Memo") at LC 1329. The memorandum concerned what Dr. Hasier characterized as Mr. Moore's "inappropriate" behavior during the February 16, 2017 meeting during which Dr. Hasier informed him that he would be detailed to the Reading Room Reference Desk. Def.'s SMF Resp. ¶ 77. The March 2 counseling memorandum talking points, which Dr. Hasier presumably conveyed to Mr. Moore during this same meeting, stated that Health Services had also concluded that it did not have adequate medical documentation to support Mr. Moore's telework request, and as a result Mr. Moore was

to begin his detail assignment to the Reading Room Reference Desk effective the next week. *Id.*
¶ 80.

The very next day, Health Services issued a "Duty Status" memorandum to Dr. Hasier, summarizing a doctor's note submitted by Mr. Moore on February 22, 2017. *Id.* ¶ 82; Pl.'s Ex. 68, LC 1546. The note was submitted to Health Services and detailed that Mr. Moore had been under his doctor's care on February 22, 2017, but that he could return to work the next day with "no prolonged standing." *Id.* In effect the March 3, 2017 HSO Memorandum functioned to summarize the doctor's note from Mr. Moore's doctor excusing him from work the week prior. But Dr. Hasier testified that she believed this memorandum replaced the March 1 HSO Memorandum that indicated Mr. Moore's current accommodations should stay in place, meaning that going forward, she believed Mr. Moore was only entitled to a medical accommodation of "no prolonged standing." *Id.* ¶ 85. However, this understanding was incorrect, and the author of both memoranda testified that the March 3, 2017 memorandum was never intended to modify, supersede or replace the March 1 HSO Memo. *Id.* ¶ 84; Pl.'s Ex. 17 ("Klauber Tr.") 86:8-87:1.

On March 6, 2017, Dr. Hasier instructed Mr. Buscher, Mr. Moore's detail supervisor while he was on loan to the Reading Room, to issue a memorandum to Mr. Moore classifying him as AWOL for not reporting to work that day as ordered. Def.'s SMF Resp. ¶ 87. Mr. Buscher accordingly sent Mr. Moore an email describing that because his telework had been terminated, he was due to begin his detail to the Geography and Maps Division Reference Team that day. *Id*; Pl.'s Ex. 71 at LC 191. The email also indicated that and if he did not report to work he would be subject to disciplinary action, including being marked AWOL. *Id.* In response, Mr. Moore contacted the Library's Chief of Staff, Elizabeth Morrison, to report that his requested medical accommodation was being ignored and he was instead being threatened with

discipline.  *Id*. ¶ 88.  Later that same day, Mr. Moore contacted Mr. Sweeney, the head of the

Library Services Unit, to relay the same concerns.  *Id*. ¶ 89.  In response, Kym Tran, the Human

Resources staffer handling the matter with Dr. Hasier, communicated with Mr. Sweeney and

stated that Mr. Moore had omitted the March 3 HSO Memorandum from his communications

with him, which she explained had supplanted the March 1 HSO Memo and reduced the

accommodations to which Mr. Moore was entitled.  *Id*. ¶ 91; Pl.'s Ex. 75 ("Tran Email") at LC

1408 (noting in an email discussing the matter that Mr. Moore "did not present [Mr. Sweeney]

with the latest medical info, which supersedes what Ryan attached.").

On March 7, 2017, Mr. Moore's doctor submitted a letter clarifying that his previous

correspondence that was memorialized in the March 3 HSO Memorandum was never intended to

replace the request for accommodation that he had previously submitted.  Def.'s SMF Reply ¶

109.  On March 10, 2017, Health Services wrote another memorandum to this effect, stating that

the March 1 HSO Memo recommendations had not been altered.  *Id.* ¶ 111.

On March 10, 2017, the Library rejected Mr. Moore's telework request via an email to

his attorney from Julia O'Brien, the Library's Associate General Counsel.  Pl.'s SMF ¶ 116.  The

email explained that the rejection was due to the fact that "neither [Mr. Moore's] position (his

detail assignment, or his position of record) lends itself to telework."  *Id.* (citing Pl.'s Ex. 84 at

LC 1866).

Three days later, Mr. Moore reached out to Mr. Buscher to request forms to request

advanced sick leave.  Pl.'s SMF ¶ 118.  He explained that the detail and cancellation of his

telework exacerbated his lymphedema.  *Id.*  Mr. Moore requested 240 hours of leave.  *Id.* ¶ 119.

Only 92 hours were approved by Mr. Buscher and behind the scenes by Dr. Hasier, who

indicated her support for the reduction in approved hours following this recommendation from

Ms. Tran, who was concerned that the 240 hours of leave would take over two years to pay back. *Id.* ¶¶ 119, 121.

On March 16, 2017, Mr. Moore filed a formal complaint with the Library's EEO office, claiming Dr. Hasier had discriminated against him for his disability and in retaliation for protected activity.  Def.'s SMF Resp. ¶ 130.  The next day he notified Mr. Buscher that the detail—specifically the acts of "fetch[ing] maps" and the "repeated bending and kneeling" was aggravating his underlying condition.  *Id.* ¶ 131.

Pursuant to the required interactive process for accommodations under the ADA, Dr. Hasier and Mr. Buscher met with Mr. Moore on April 7, 2017 to discuss his requested accommodations.  Def.'s SMF ¶ 33.  At this meeting Dr. Hasier reiterated that she did not believe Mr. Moore's position could lend itself to telework, but she asked Mr. Moore to provide a list of all of the tasks he had performed while teleworking between October and December of the previous year.  Def.'s SMF Resp. ¶¶ 141, 143.  Shortly following the meeting, Dr. Hasier assigned Mr. Moore a second day of backup coverage at the reference desk.  *Id.* ¶ 145.

On April 17, 2017, Dr. Hasier formally denied Mr. Moore's telework request, citing what she believed was a lack of sufficient telework friendly work that could fill even one day of remote work for Mr. Moore.  *Id.* ¶ 148.  Dr. Hasier also stated that she was "open to any suggestions" Mr. Moore had regarding effective telework alternatives, and indicated that the Library would request additional information from his physician regarding this inquiry as well. Pl.'s Ex. 28 at LC 1392.

Mr. Moore appealed the determination to Mark Sweeney, the Associate Librarian for Library Services the next day.  Def.'s SMF Resp. ¶ 149.  He asked for either the continuation of

two days of medical telework, to have his time at the reference desk detail reduced, or to have his telework accommodation reinstated at the end of detail.  Def.'s SMF Resp. ¶ 149; Pl.'s Ex. 102.

Mr. Sweeney formally rejected Mr. Moore's telework request in a memorandum dated May 16, 2017 ("Sweeney Appeal Denial"), Pl.'s Ex. 29; *see also* Pl.'s SMF ¶ 156.  In making his determination, Mr. Sweeney stated he "discussed this matter with your supervisors and other Library management officials," *id.,* and was informed by Ms. O'Brien from the General Counsel's office that Heath Services had not been supplied with adequate medical documentation to support Mr. Moore's professed need to telework on a medical basis.  Def.'s SMF ¶ 44; Def.'s Ex. 38 at 241.  The Sweeney Decision memorandum stated that, Heath Services' "efforts to obtain a clear picture about your accommodation needs (if any) have resulted in a less than fully responsive letter from your physician with conclusory statements rather than objective medical documentation."  Def.'s Ex. 38 at 241.  However, Mr. Sweeney still determined that Mr. Moore could telework on a one-day-per-week basis, after conferring with Dr. Hasier who reevaluated her prior determination and concluded that there was enough work to support Mr. Moore teleworking once a week.  Def.'s SMF ¶ 45.  Mr. Sweeney also testified that he made this decision, at least in part, because "it was clear to me at that point that there was, you know, a medical issue."  Pl.'s Ex. 14 ("Sweeney Tr.") 128:20–130:15.  The same memorandum also permanently reassigned Mr. Moore to the Reference Section.  Def.'s SMF Resp. ¶ 170.  Mr. Moore never submitted additional medical documentation to support his telework request.  Def.'s SMF ¶ 49.

### D.  Mr. Moore's Non-Selection to the Temporary, Acting, and Permanent Head of Reference and Reader Services

#### 1.  Temporary Head of Reference and Reader Services

In January 2018, Mr. Buscher retired as head of the Reading Room, opening up a 120-day detail to serve as the head of Reference and Reader Services.  Pl.'s SMF ¶ 176–77.  The position was responsible for supervising and managing all aspects of the Reading Room.  Def.'s SMF ¶ 51.  The detail was made open to any Library Services staff that wished to apply.  *See* Def.'s Ex. 6 ("Hasier Tr.") 192:14-15, ECF No. 21-6.  Dr. Hasier was in charge of the selection process.  Def.'s SMF Resp. ¶¶ 177–78.

Mr. Moore applied for the position on December 20, 2017.  *Id.* ¶ 184.  Stephanie Stillo, the curator of the rare book collection at the Library, also applied on January 3, 2018.  *Id.* ¶¶ 180, 185.  Dr. Hasier selected Ms. Stillo for the temporary detail after evaluating her application using an assessment of weighted factors she received from the Library's Human Capital Directorate.  *Id*. ¶ 186.  The factors were the knowledge, skills, and abilities ("KSAs") relevant to the position.  Hasier Tr. 192: 14–193:11.  The Library justified its decision by asserting that of all the applicants, Ms. Stillo had the most supervisory experience.  *Id*; Def.'s SMF ¶ 54–55.  This experience included supervising students and acting as a project manager while serving as a Visiting Professor of Digital History at Washington and Lee University for two years prior to her tenure at the Library.  Def.'s SMF ¶ 54–55.  The Library also claims that Ms. Stillo was selected for her experience in digital humanities, exhibition management, data visualization, and special collection curation.  *Id.* ¶ 55.  In her application, Ms. Stillo also discussed her experience assisting students, scholars, colleagues, and members of the public seeking information in the Rare Books Division.  *Id.*

In contrast, Dr. Hasier found Mr. Moore lacking the requisite supervisory experience. Hasier Tr. 198:3–9. Mr. Moore takes issue with this assessment, arguing that he had superior supervisory experience compared to Ms. Stillo, citing his time as a lead librarian at the Cleveland Library where he gained supervisory experience in the library environment (in contrast to Ms. Stillo's experience that was instead focused in the classroom), in addition to his familiarity with the Geography and Maps Division itself, with experience managing the Library's cartographic collections, providing reference services, and his knowledge of the Geography and Map Division's collections. Pl.'s SMF ¶ 189–90. He had also taken graduate level courses on Library Management. *Id.* ¶ 190.

Following Mr. Moore's non-selection for the temporary detail, he circulated an email to union members communicating his intent to report Ms. Stillo's selection to the Equal Employment Opportunity office, and solicited information from other non-selected candidates. *Id.* ¶ 198. Dr. Hasier learned of the email from another library employee and reached out to her supervisor, Helena Zinkham, stating that she felt Mr. Moore's actions "bordered on harassment as opposed to constructive dialogue." Pl.'s Ex. 115 at LC 2852; *see also* Pl.'s SMF ¶¶ 198–202. At her deposition she stated that at this time she was looking for "any process in place for supervisors" to take action against "what [she] felt was harassment." Pl.'s SMF ¶ 202 (citing Hasier Tr. at 189:11–12).

While Ms. Stillo was serving her detail as the temporary head of Reference and Reader Services, she had an incident with Mr. Moore. Due to his light sensitivity, Mr. Moore had been extended an accommodation for reduced lighting above the Reference Desk. Pl.'s SMF ¶ 203. Ms. Stillo had not been informed of the accommodation, and had the lights replaced in response to user complaints. *Id.* This aggravated Mr. Moore's underlying disability. *Id.* Once Ms. Stillo

was notified about Mr. Moore's accommodation, the lights were immediately returned to their prior, dimmer setting.  Def.'s SMF Resp. ¶ 203.  However, Mr. Moore alleges that Ms. Stillo was assisted in the light replacement effort by Jennifer Somosky, Dr. Hasier's executive secretary, who knew of Moore's accommodation and kept Dr. Hasier apprised of the lighting replacement effort.  Pl.'s SMF ¶ 203.

2. Permanent Head of Reference and Reader Services Position

While Ms. Stillo served her detail as the temporary head of Reference and Reader Services, the Library began the hiring process to identify a candidate to permanently fill this position.  Dr. Hasier, as the selecting member for the hiring decision, created the vacancy announcement and organized a three-member panel to run the selection process.  In addition to herself, Dr. Hasier selected Lisa Masengale, a member of the Science and Technology and Business Division of the Library, and Grant Harris, a member of the Library's European Division to serve on the selection panel.  Defs' SMF Resp. ¶¶ 209–210: Hasier Tr. at 241:5-15.

Mr. Moore was selected for an interview based on his application for the position.  Pl.'s SMF ¶ 208.  According to the governing protocol, panelists were supposed to ask the same questions of each interviewee.  *Id.* ¶ 212; *see also* Def.'s SMF ¶ 61.  Mr. Moore contends that he was asked at least one question that was not asked of the other applicants.  Pl.'s SMF ¶ 218.  Mr. Moore also believes that he was unfairly scored during his interview, pointing to two interview questions where based on his responses he claims to have met the requirements for a higher score.  *See* Pl.'s SMF ¶¶ 215–216 (examining in detail the two questions Mr. Moore asserts he was unfairly scored on).  The Library claims that the scores were fair because all panelists scored Mr. Moore similarly for the questions at issue.  Def.'s SMF Resp. ¶ 216.  In terms of the

applicants' final scores, Mr. Moore ranked at the bottom, tying with one other applicant for the lowest score.  Def.'s SMF ¶ 63.

The panel ultimately selected Kathy Hart for the permanent position, citing her superior credentials and supervisory experience.  *See* Def.'s SMF ¶ 55.  Ms. Hart was rated most highly by each of the panelists on the selecting committee.  *Id.* ¶ 62.  Because Ms. Hart was unable to onboard immediately, Dr. Hasier appointed Renee Sayles, another Library employee in a different section, to act as the head for Reference and Reader Services until Ms. Hart's start date. Pl.'s SMF ¶¶ 206–07.  Dr. Hasier testified that she believed this was required due to the position being "encumbered" by Ms. Hart's selection, and thus no longer open to another detail under Library policy.  Hasier Tr. at 207:5–10.  The Library now admits that this was not the case.  Pl.'s Opp'n at 38.

### E.  Additional Actions Against Mr. Moore

Beginning in March 2017, when Mr. Moore began to pursue a formal medical telework accommodation with the Library, Dr. Hasier began eliminating many of the duties Mr. Moore could perform on telework.  She asked him to resign from his position as Executive Secretary of the Phillips Society, excluded him from meetings for his collections, took away his EAD finding aid duties for two months, removed his work creating carto-bibliographic findings aides, eliminated his lecture series, rejected his proposals to host events, eliminated the Occasional Paper series for which he was the editor, and reduced his participation in the Ask a Librarian questions series.  *See* Def.'s SMF ¶¶ 224–38.  She also refused to grant him administrative leave to travel to Denver to give a speech to the Rocky Mountain Map Society unless he flew out after working hours.  *Id.* ¶ 228.

In response to these acts, Mr. Moore began looking for other job opportunities within the Library.  When investigating a two-day a week detail to the Library's Acquisitions and Bibliographic Access Military Science Section, Dr. Hasier allegedly intervened and asked Ms. Sayles to tell Mr. Moore that if he wanted to participate in the detail, he would have to forfeit his telework day, or only participate in it one day per week, reducing the value of the training.  *Id.* ¶ 240.  At the end of this detail, Mr. Moore's detail supervisor invited him to extend his time working on the detail.  Ms. Hart and Dr. Hasier denied this request.  *Id.* ¶ 242.

Mr. Moore also alleges that in agreement with Dr. Hasier, Ms. Hart accused Mr. Moore of plagiarism and engaging in unethical conduct by writing stories for non-Library publications. *Id.* ¶ 244.  Mr. Moore's blogging privileges were suspended temporarily.  *Id.*  Several months later, Ms. Hart revoked her support for Mr. Moore to give a presentation in the Librarian of the Congress' office to a veteran's group, instead assigning the role to another staff member.  *Id.* ¶ 246.

### F.  Procedural History

The Library has now moved for summary judgment on three of Mr. Moore's claims.  *See* Def.'s Mem. of P. and A. Supp. of Def.'s Mot. Summary J. ("Def.'s MSJ"), ECF No. 22.[2]  Mr. Moore has filed an opposition, *see* Pl.'s Opp'n Summary J. ("Pl.'s Opp'n"), ECF No. 27, and the Library has filed its reply, *see* Def.'s Mem. of P. and A. in Reply to Pl.'s Opp'n to Def.'s Mot. for Summary J. ("Def.'s Reply"), ECF No. 40.  The motion is now ripe for consideration.[3]

---

[2] Of the six actions alleged to constitute acts of discrimination and/or retaliation by the Library, the Library addresses only the non-selections.  *See* Def.'s MSJ at 13–16; *cf.* Comp. ¶¶ 55, 62, 59, 65.  Accordingly, this Court considers this motion to be a partial motion for summary judgment.

[3] Following the conclusion of briefing, Mr. Moore filed a Motion for Leave to File Surreply (Pl.'s Surreply"), ECF No. 43.  The Library opposes this motion.  *See* Mem. in Opp. to

### III.  LEGAL STANDARD

### A.  Summary Judgment Standard

The principal purpose of summary judgment is to streamline litigation by disposing of factually unsupported claims or defenses and determining whether there is a genuine need for trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  Accordingly, summary judgment is appropriate where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). The movant bears the initial burden of identifying portions of the record that demonstrate the absence of any genuine issue of material fact.  *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323.  A "material" fact is one capable of affecting the substantive outcome of the litigation, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), while a dispute is "genuine" if there is enough evidence for a reasonable jury to return a verdict for the non-movant, *see Scott v. Harris*, 550 U.S. 372, 380 (2007).  If the moving party meets this burden, then the non-movant must point to specific facts in the record that reveal a genuine issue that is suitable for trial.  *See Celotex*, 477 U.S. at 324.[4]  The nonmovant must provide evidence that would permit a

Pl.'s Mot. for Leave to File Surreply, ECF No. 44.  This Court is entrusted with the discretion to grant leave to file a surreply.  *See Khine v. United States Dep't of Homeland Sec.*, 334 F. Supp. 3d 324, 331 n.6 (D.D.C. 2018), *aff'd*, 943 F.3d 959 (D.C. Cir. 2019)).  Such leave may be granted when the "movant's reply in fact raises arguments or issues for the first time," when the "proposed surreply would be helpful to the resolution of the pending motion" and the other party would not be "unduly prejudiced."  *Glass v. Lahood*, 786 F. Supp.2d 189, 231 (D.D.C. 2011), *aff'd*, No. 11-5144, 2011 WL 6759550 (D.C. Cir. 2011).  The Court finds Mr. Moore's surreply to be helpful to the resolution of the pending motion by providing additional clarity on certain of his arguments, particularly in response to issues raised in depth for the first time in the Library's reply brief.  Furthermore, prejudice to the Library appears minimal.  Therefore, the Court grants Mr. Moore's motion to file the surreply and will consider its contents herein.

[4] This Court has supplemented Rule 56 with Local Civil Rule 7(h), pursuant to which a party filing a motion for summary judgment must include a statement of material facts as to which that party contends there is no genuine dispute.  *See Herbert v. Architect of Capitol*, 766

reasonable jury to find in his or her favor.  *See Laningham v. U.S. Navy*, 813 F.2d 1236, 1242

(D.C. Cir. 1987).

When evaluating whether a genuine dispute of fact exists, a court must refrain from

making credibility determinations or weighing the evidence; rather, "[t]he evidence of the non-

movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson*,

477 U.S. at 255; *see also Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007).  However, a

conclusory assertion offered without any evidentiary support does not establish a genuine issue

for trial.  *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).  And because the

nonmovant's evidence must allow a reasonable jury to find in its favor, "merely colorable" or

"not significantly probative" evidence will not preclude summary judgment.  *Potter*, 558 F.3d at

549 (quoting *Anderson*, 477 U.S. at 249–50).

## IV.  ANALYSIS

### A.  Mr. Moore's Failure to Accommodate Claim

The Court will begin where this entire dispute began—with Mr. Moore's failure to

accommodate claim.  Mr. Moore argues that the Library violated the ADA by refusing to provide

him with a medically necessary telework accommodation and by participating in the ADA-

mandated interactive accommodations process in bad faith.  Pl.'s Opp'n at 44, 53.  In response,

the Library maintains that Mr. Moore did not provide a medically valid reason to justify his

---

F. Supp. 2d 59, 63–64 (D.D.C. 2011).  "The party opposing the motion must, in turn, submit a
statement enumerating all material facts which the party contends are genuinely disputed."  *Id.* at
63 (citing LCvR 7(h)(1)).  Accordingly, "evidence laying dormant in the record is not enough,
for the district court is not obliged to sift through hundreds of pages of depositions, affidavits,
and interrogatories in order to make [its] own analysis and determination of what may, or may
not, be a genuine issue of material disputed fact."  *Potter v. District of Columbia,* 558 F.3d 542,
550 (D.C. Cir. 2009) (internal quotations omitted).

requested accommodation, and that it participated in the interactive accommodations process in good faith.  Def.'s MSJ at 38, 40.  The Court concludes, for the reasons enumerated below, that the question of whether Mr. Moore's requested two-day per week telework accommodation was reasonable presents a genuine disputed issue of material fact that a reasonable jury could find in Mr. Moore's favor.  Accordingly, summary judgment is denied, and this claim must proceed to trial.

### 1.  Legal Standard

Under the ADA, federal agencies commit unlawful discrimination if they fail to provide "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A).[5]  To succeed on this claim, it is the responsibility of Mr. Moore to demonstrate that (1) he was an employee with a disability;

---

[5] Mr. Moore technically brings his claims under the Congressional Accountability Act ("CAA"), 2 U.S.C. §§ 1301, *et seq*., and more specifically under 2 U.S.C. § 1302(a)(3), which extends the ADA to employees of the legislative branch of the Federal Government.  *See* Compl. ¶ 3.  However, the version of the CAA which was in effect when this action was filed specifically omitted Library employees from its protections.  *See* § 2 U.S.C. 1301(3) (2010) (omitting Library employees from the definition of a "covered employee"); *see also Baker v. Library of Cong*., 260 F. Supp. 2d 59, 64 (D.D.C. 2003) (noting that the CAA pre-2018 amendment "does not extend to [Library] employees").  Rather, at this time, the ADA applied directly to Library employees, without the need for the CAA's extension provisions.  *See* 42 U.S.C. § 12209(4); *see also Brown v. Hayden*, No. 18-cv-2561, 2020 WL 6392746, at *10 (D.D.C. Nov. 2, 2020) (noting "before March 23, 2018, the ADA explicitly applied to [Library] employees").  This practically has little impact on this case, given that Mr. Moore's complaint details ADA violations, providing sufficient notice to the Library about the substance of his claims, and both parties argued the substantive issues in this summary judgment briefing as if they were brought as ADA claims.  Consequently, the Court will analyze Mr. Moore's claims directly under the ADA.

The CAA was, however, amended in 2018 to include Library employees within its coverage and became effective on March 23, 2018, a little more than one month after this action was instigated on February 28, 2018.  *See* Pub. L. 115-141, Div. I, Title I, § 153(a)(1)(A), Mar. 23, 2018, 132 Stat.785.  However, because this action was already pending at the time of amendment, the pre-amendment regime governs.

(2) that his employer had notice of the disability; (3) that with reasonable accommodation he could perform the essential functions of his job; and (4) that his employer refused to make reasonable accommodations. *Dougherty v. Cable News Network*, 396 F. Supp. 3d 84, 96 (D.D.C. 2019); *see also Flemmings v. Howard Univ.*, 198 F.3d 857, 861 (D.C. Cir. 1999). Three of these four factors are settled, as the Library explicitly concedes that Mr. Moore was a disabled person as defined by the ADA, and does not dispute that it had notice of his disability and that he could perform the essential aspects of his position. Def.'s MSJ at 38; *see also* Pl.'s Opp'n at 43. Consequently, whether summary judgment is appropriate turns on whether Mr. Moore's requested accommodation of two days per week of telework—which was denied by the Library—was a reasonable request based on his medical need. This is because federal discrimination law "covers requests for only those accommodations that are 'reasonable.'" *Scarborough v. Natsios*, 190 F. Supp.2d 5, 25 (D.D.C. 2002).[6] Such a determination "is fact-specific and must be evaluated on a case-by-case basis." *Kennedy v. Dresser Rand Co*., 193 F.3d 120, 122 (2d Cir. 1999).

### 2. Analysis

*a. A Reasonable Jury Could Conclude that Mr. Moore's Telework Request was a Reasonable Accommodation*

The Library argues that Mr. Moore's request for two days of telework for medical reasons was "not borne out by the evidence" of his work history nor the medical documentation submitted on his behalf, meaning it was not a reasonable request. Def.'s MSJ at 38. In response,

---

[6] While *Scarborough v. Natsios* reviewed a failure to accommodate claim under the Rehabilitation Act, because the Rehabilitation Act and the ADA have similar standards, courts generally use cases interpreting the Rehabilitation Act and ADA interchangeably. *See, e.g., American Council for the Blind v. Paulson*, 525 F.3d 1256, 1260, n.2 (D.C. Cir. 2008) ("cases interpreting either [statute] are applicable and interchangeable.").

Mr. Moore claims that the record demonstrates that a jury could conclude that this explanation—that he did not provide sufficient documentation to support telework and that his work history somehow undermined his request—was false.  Pl.'s Opp'n at 44.  The Court agrees.  Interpreting the evidence in the light most favorable to Mr. Moore, a rational jury could determine that Mr. Moore's telework request was reasonable due to the support provided for this course of action by his physician.

The Library begins by arguing that Mr. Moore's asserted medical need to telework is contradicted by his own work history.  Def.'s MSJ at 37–42.  It points to Mr. Moore's deposition testimony where he stated that his lymphedema condition has been "fairly stable" since high school.  *Id*. at 38; Def.'s Ex. 2 ("Moore Tr.") at 130:13–25.  The Library also seeks to make much of the fact that during the first ten years of Mr. Moore's professional career, which was spent first at the Cleveland Library and then during his first three years at the Library, he did not telework at all.  Def.'s MSJ at 38.  It also identifies that Mr. Moore does not claim that his condition worsened in 2011, at the time during which he began to telework two-days a week pursuant to a non-medical agreement with the Library.  *Id*.  The Court finds this evidence does not, contrary to the Library's assertion, "plainly show[] that [Mr. Moore] had no medically based need for telework."  *Id*.  It is entirely plausible that Mr. Moore was entitled to an accommodation earlier in his career and simply did not pursue it, or that his condition worsened around the time he began to telework in 2011, but he did not document this change given that his supervisor at the time allowed him to take non-medical telework without any such documentation.

Accordingly, given the limited relevance of Mr. Moore's prior work history, a reasonable jury could still find Mr. Moore had a medical need to telework due to his disability.[7]

And indeed, perhaps recognizing the relative weakness of its prior argument, the Library's primary justification for refusing to grant Mr. Moore's telework request is its assertion that "[h]is doctor provided no objective clinical basis for this recommendation." Def.'s MSJ at 38. But the Library does not make clear what a proper "objective clinical basis" would be, or explain what information was lacking.[8] In explaining how the decision to reject Mr. Moore's

---

[7] The Court can also quickly dispose of the Library's argument that Mr. Moore's "personal choices" demonstrate that his telework request was not medically necessary. Def.'s Reply at 33 n.8. The Library seems to claim that because Mr. Moore relocated his family to a location further away from the Library (which increased his commute which can aggravate his disability) and because he applied to positions in 2018 that "as far as he knew would not allow telework," that the Court should conclude his disability was not so serious as to require a telework accommodation. Def.'s MSJ at 38–39. This is an inference the Court cannot make. As Mr. Moore stated, his commute was minimized due to a flex schedule that allowed him to travel at off-peak times, Pl.'s Opp'n at 52, and he also testified that he did not know if the positions to which he applied restricted telework. Pl.'s Ex. 1 Moore Tr. at 201:2-10. Furthermore, the notion that Mr. Moore should be penalized due to where he chooses to reside with his family—a decision that was almost certainly made with not just his needs in mind—is not one the Court will entertain.

[8] Dr. Thompson, Mr. Moore's medical provider, sent three separate notes to the Library in support of Mr. Moore's accommodation request. *See* Def.'s Ex. 20 ("Dr. Thompson Feb. 17, 2017 Letter"); Pl.'s Ex. 3 ("Feb. 22, 2017 Request for Medical Accommodation"); Def.'s Ex. 36 ("Dr. Thompson April 28, 2017 Letter"). Dr. Thompson's letters detail that in his medical opinion, "supported by respected medical literature," Mr. Moore "has managed his condition very well over the years and avoided many of the common complications for this condition as a result of his diligent care and concern" and that he "believe[d] that maintaining the same accommodations previously granted to the patient over the past seven years are reasonable and have allowed both productive high quality work to be accomplished while allowing proper management of lymphedema and prevention of more severe complications. . ." April 28, 2017 Letter at LC 1532–33. With regard to telework, he noted that Mr. Moore's "condition is effected by his commute" but "[t]elework appears to have been beneficial in managing the condition and preventing complications while maintaining productivity over the last seven years. I continue to support the request for telework. . ." *Id.* To support this request, he noted that Mr. Moore's pain is a 2–3 out of 10 at baseline, but after a day spent commuting and working in the office he registers a pain level of 8–9 out of 10. Feb. 22, 2017 Request for Medical Accommodation at 4.

request was made, the Library takes pains to note that the final determination to deny Mr. Moore

his request for two-days per week of medical-based telework (while granting him a single day of

telework without a medical justification) was made by Mark Sweeney, who in turn relied on

communications from the head of Health Services, Dr. Charles, who had concluded that the

medical documentation supplied by Mr. Moore was insufficient to support telework as a

medically-based accommodation.  *See* Def.'s Reply at 30; Sweeney Tr. 113:8–116:10.  Mr.

Sweeney's May 16, 2017 memorandum rejecting Mr. Moore's appeal stated that the Health

Services' "efforts to obtain a clear picture about your accommodation needs (if any) have

resulted in a less than fully responsive letter from your physician with conclusory statements

rather than objective medical documentation."  Pl.'s Ex. 29 ("Sweeney Appeal Denial") at LC

249.  No additional details or explanation pointing out specific deficiencies were provided, nor

was Mr. Moore's physician afforded an opportunity to provide additional support for his medical

conclusion that telework was appropriate. [9]

     In opposing summary judgment, Mr. Moore contends that the record shows "something

fishy was going on" and a reasonable jury could find that "[Mr.] Moore's doctor had provided

adequate documentation to support the telework request."[10]  Pl.'s Opp'n at 49; *see id.* at 44, 47.

---

It is unclear to the Court what sort of further objective clinical evidence was required to support
Mr. Moore's reports concerning the pain he experienced as a result of his condition.

    [9] The Library's focus in its briefing on this rationale also glosses over the fact that Mr.
Moore's request was originally denied by his immediate supervisor Dr. Hasier, two different
times on different grounds before it reached Mr. Sweeney on appeal.  The first denial occurred in
early March 2017, when Dr. Hasier informed Mr. Moore that she "ha[d] been advised that the
HSO does not have documentation to support telework," Def.'s SMF Resp. ¶ 80, and then again
in early April because she claimed that his telework accommodation was denied because his
position did not "lend itself to telework."  Def.'s SMF Resp. ¶¶ 141, 148.

    [10] At times in Mr. Moore's opposition brief he appears to assert an independent
discrimination claim based on his disability, in addition to his failure to accommodate claim.  *See*
Pl.'s Opp'n at 46–51.  The Library also then responds to this analysis in their reply brief.  Def.'s

To make this point, he relies heavily on a March 1, 2017 memorandum from the Library's Heath Services which he argues concluded that there was sufficient medical documentation to support his two-day a week telework request. *Id.* at 44, 47; *see also* Pl.'s Ex. 24 ("March 1 HSO Memorandum") at LC 1327.  In the context of the accommodations process, the Library's Health Services Office is responsible for reviewing the information provided by an employee's healthcare provider and will then inform the relevant Library decisionmakers as to the proper accommodations to be put into place. *See* Sweeney Tr. at 105:3-14.  This is what occurred in Mr. Moore's case, following his submission of a Request for Medical Documentation form completed by his physician, Dr. Thompson. *See* Feb. 22, 2017 Request for Medical Accommodation.  The plain text of the March 1 HSO memorandum does indeed appear to indicate that Mr. Moore had submitted adequate medical documentation for his requested accommodations.  The memorandum reads, "[t]he Office of Health Services received medical documentation that indicates that Mr. Moore has a chronic medical condition. . . *[t]he medical documentation supports the continuation of [Mr. Moore's prior accommodations, including t]elework two days per week.*  These restrictions are to be considered permanent."  March 1 HSO Memorandum at LC-1328 (emphasis added).  During her deposition, Dr. Charles, the head of Health Services, admitted that the March 1 HSO Memorandum could "reasonably by interpreted

---

Reply at 28–32.  However, the Library moved for summary judgment only as to Mr. Moore's failure to accommodate claim, not on any disability discrimination claim.  And an argument is waived if not raised in a party's opening brief. *See Walker v. Pharm. Research & Mfrs. of Am.*, 461 F. Supp. 2d 52, 58 n.9 (D.D.C. 2006).  Accordingly, the Court will not evaluate any argument at this time as to a separate disability discrimination claim.  Given this confusion, the Court also seeks to clarify for the parties that for Mr. Moore to establish his failure to accommodate claim he is not required to demonstrate that his accommodation request was denied for retaliatory or discriminatory reasons.  Pretext evidence such as this would only be relevant to a separate claim of discrimination or retaliation based on Mr. Moore's disability, which as described is not properly at issue here.

as indicating that there was medical documentation to support [Mr. Moore's] telework request. Pl.'s Ex. 23 ("Charles Tr.") at 33:6–13. Additionally, a contemporaneous note to file drafted by Ms. Klauber, the Health Services nurse who managed Mr. Moore's request and drafted the March 1 HSO Memorandum, recorded that during a February 28, 2017 meeting to review Mr. Moore's request, both she and Dr. Charles concluded that "[t]he portion of the request completed by the doctor did support the employee's requests." Pl.'s Ex. 25 ("Klauber Note to File") at LC-1335. There is no mention in either of these pieces of evidence of an insufficient "objective clinical basis" to follow Mr. Moore's doctor's recommendation.

But this interpretation of the March 1 HSO Memorandum has since been directly contradicted by Ms. Klauber. She testified at her deposition that the memorandum was intended only to memorialize that the Health Services office had received documentation from Mr. Moore's medical provider in support of his request, and that the mere receipt of this documentation did not mean that Health Services agreed with this position or that it had finished its own assessment of the issue. *See* Def.'s Ex. 22 ("Klauber Tr.") 17:8–21 (noting that she "provides guidance to the supervisor as to what the doctor is requesting" but "make[s] no recommendation about whether or not the accommodation should be approved or rejected); *id.* 84:7–8 (indicating the contents of the March 1 HSO Memo only indicated that "[t]he doctor had recommended the accommodations."). She also argues that her Note to File was similarly nonconclusive, pointing to the rest of the note that indicated that both she and Dr. Charles had difficulty reading the document due to the "quality from fax and penmanship." Decl. of Arlene Klauber ("Klauber Decl."), at 1, ECF No. 41-1.

This disagreement over the meaning of the March 1 HSO Memo is, as Mr. Moore correctly notes in his surreply, a dispute of material fact sufficient to defeat summary judgment.

Pl.'s Surreply at 2.  For where there is a "conflicting interpretation of the evidence in the record . . . summary judgment is inappropriate on this claim." *Walker v. England*, 590 F. Supp. 2d 113, 145 (D.D.C. 2008).  Because a reasonable juror could conclude that the March 1 HSO Memo shows that Mr. Moore's requested accommodation was indeed a reasonable accommodation and had a sufficient medical basis, this claim must proceed to trial.

The record also contains additional evidence that could lead a juror to conclude that others at the Library also believed that Mr. Moore's requested telework accommodation was reasonable, and it was ultimately denied for phony reasons.  For example, Mr. Moore was initially given a number of shifting explanations for why his request for a telework accommodation was being denied.  His direct supervisor, Dr. Hasier, initially told him on March 2, 2017 that the request was denied for a lack of medical documentation, Def.'s SMF Resp. ¶¶ 77–81, even though she later testified that no Health Services employee or other Library employee had told her this was the case (and arguably a plain reading of the March 1 HSO Memo, that was sent to Dr. Hasier just the day before, stated otherwise).  Hasier Tr. at 131:6–17.  But Dr. Hasier then informed Mr. Moore in a meeting on April 7, 2017 and via a formal memorandum ten days later that his request was rejected because his position did not "lend itself to telework," as there was not enough work to support a single day of telework per week.  Def.'s SMF Resp. ¶¶ 141, 148.  This rationale was later overturned by Mr. Sweeney, and Dr. Hasier admitted her previous determination was wrong.  Def.'s SMF Reply ¶¶ 165–66.

Following the appeal to Mr. Sweeney, the Library then returned to Dr. Hasier's original rationale that there was a lack of sufficient medical support for Mr. Moore's telework request, *see* Sweeney Appeal Denial, but a number of irregularities accompanied this finding.  First, this determination was communicated by Dr. Charles to Julia O'Brien, the Library's counsel,

verbally, instead of in writing as was standard practice.  Indeed, Dr. Charles even acknowledged this irregularity, noting that this type of recommendation was "the kind [of] advice that would be put in a memo." Pl.'s Ex. 23 ("Charles Tr.") 89:18–21.  And despite rejecting Mr. Moore's telework request on the ground of inadequate medical evidence, Mr. Sweeney decided to put in place a one-day per week, non-medical telework accommodation for Mr. Moore, a decision that he explained was due to his conclusions that "it was clear to me at that point that there was, you know, a medical issue."  Pl.'s Ex. 14 Sweeney Tr. 128:20–130:15.  Such a conclusion, of course, directly undermines the Library's stated conclusion regarding Mr. Moore's requested accommodation, that telework was *not* a reasonable accommodation for Mr. Moore's disability. Taken together, the record shows a genuine dispute of fact as to whether Mr. Moore's requested accommodation was reasonable.  This claim must proceed to trial.[11]

### B. Hostile Work Environment

The Library also moves for summary judgment on Mr. Moore's second claim, regarding his allegation that he was subject to a discriminatory and retaliatory hostile work environment from February 2017 through the Fall of 2018.  Compl. ¶¶ 75–77.  In support of this claim, Mr.

---

[11] The Library also asserts it is entitled to summary judgment on Mr. Moore's alternative argument that he was denied a reasonable accommodation because the Library failed to participate in the ADA-required interactive process in good faith.  Def.'s MSJ at 39–42.  Because the Court has already determined that summary judgment is inappropriate, it declines to evaluate this alternative argument as well.  However, it notes that given that the cited delays in the interactive process amount to an at most three-month delay that had no apparent impact on the ultimate decision, it appears unlikely a reasonable jury would conclude the Library acted in bad faith in the interactive process based only on this short delay.  *See, e.g., Matos v. DeVos*, 317 F. Supp. 3d 489, 499 (D.D.C. 2018), *aff'd*, No. 18-cv-5281, 2019 WL 2563721 (D.C. Cir. June 3, 2019) (finding nearly two-year delay in accommodation not unreasonably long); *Weatherspoon v. Azar*, 380 F. Supp. 3d 65, 72 (D.D.C. 2019) (declining to find six-month delay unreasonable). Of course, given that allegedly phony reasons were given for the denial, there may be other reasons a reasonable jury could conclude the Library acted in bad faith during the interactive process.

Moore identifies nearly twenty discrete actions that he alleges together formed an "interrelated hostile work environment."  Pl's Opp'n at 31; *see also id.* 28–31.  These actions fall into three general categories, including: (1) specific personnel actions or determinations made by the Library; (2) allegedly offensive comments directed at Mr. Moore, primarily made by Dr. Hasier; and (3) allegedly retaliatory actions taken by Library management against Mr. Moore.  Def.'s SMF ¶ 71; *see also* Pl.'s Opp'n at 28–31.  In its motion for summary judgment, the Library argues that these actions constitute isolated incidents that do not constitute the type of severe or pervasive conduct required for a hostile work environment claim.  Def.'s MSJ at 29.  For the reasons given below, the Court disagrees, and will therefore allow Mr. Moore's hostile work environment claim to go to trial.

### 1.  Legal Standard

The ADA prohibits employers from creating a hostile work environment targeting individuals based on their disability or in an act of retaliation for protected activity.  *See Floyd v. Lee*, 85 F. Supp. 3d 482, 516 (D.D.C. 2015).  In order to demonstrate a hostile work environment, a plaintiff must show that "his employer subjected him to discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment."  *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (internal quotation omitted).  Harassment is severe or pervasive when it creates "an environment that a reasonable person would find hostile or abusive and that the victim in fact subjectively perceives as abusive."  *Maestre v. SDH Servs. E., LLC*, No. 18-cv-02494, 2019 WL 7037484, at *5 (D.D.C. Dec. 20, 2019) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  Given this standard, "the ordinary tribulations of the workplace, [i.e.,] a series of petty insults, vindictive behavior, and angry recriminations . . . are

not actionable" under a hostile work environment theory. *Newell v. Mnuchin*, No. 17-cv-2695, 2020 WL 136648, at *18 (D.D.C. Jan. 13, 2020) (citing *Brooks v. Grundmann*, 748 F.3d 1273, 1277–78 (D.C. Cir. 2014)).  While there is "no mathematically precise test" for courts to use while making this determination, *Harris,* 510 U.S. at 22, the D.C. Circuit and Supreme Court had instructed lower courts to look "to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance," *Baloch*, 550 F.3d at 1201 (citing *Faragher v. City of Boca Raton,* 524 U.S. 775, 787–88 (1998).  The hostile work environment standard is intentionally designed to be "sufficiently demanding" in order to avoid becoming a "general civility code." *Faragher*, 524 U.S. at 788.

## 2.  Analysis

The Library argues that summary judgment is proper on Mr. Moore's hostile work environment claim because all of the actions underlying his claim "constitute isolated incidents over almost a two-year period" that "do not rise to the level" of severe or pervasive conduct and "are not similar in type and evince no intimidation, ridicule, or insult."  Def.'s MSJ at 29, 32. Mr. Moore contends that this assertion is "legally and factually wrong."  Pl.'s Opp'n. at 23.  The Court agrees with Mr. Moore and concludes that a reasonable juror could find that he was subjected to behavior sufficiently extreme that it fundamentally altered the conditions of his employment and created an abusive working environment.

### a.  Discrete Incidents

As a preliminary matter, the Court will first address the Library's charge that Mr. Moore cites only discrete incidents to support his claim of a hostile work environment.  As the Library correctly notes, Def.'s MSJ at 31, "this jurisdiction frowns on plaintiffs who attempt to bootstrap

their alleged discrete acts of retaliation into a broader hostile work environment claim." *See Thomas v. Securiguard Inc.*, 412 F. Supp. 3d 62, 91 (D.D.C. 2019).  Generally, "[c]ourts do so because they fear that plaintiffs will use hostile-work-environment claims as a conduit to introduce otherwise-time-barred claims into their complaint." *Samuel v. Metro. Police Dep't*, 258 F. Supp. 3d 27, 49 (D.D.C. 2017).  But no such concern has been raised here.  And there is no outright prohibition on this type of pleading as long as the requirements of each claim are met, as plaintiffs remain "free to plead alternative theories of harm that might stem from the same allegedly harmful conduct." *Baird v. Gotbaum*, 662 F.3d 1246, 1252 (D.C. Cir. 2011).

This hesitance by the courts is also due to the fundamental differences between discrete acts of retaliation or discrimination and hostile work environment claims.  Hostile work environment claims "are different in kind from discrete acts" as they require repeated and ongoing conduct of a similar type, related in time, that together cumulatively form a hostile work environment.  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002).  In distinguishing between the two types of claims, the D.C. Circuit has held that when discrete acts of discrimination or retaliation "collectively meet the independent requirements of that claim," meaning they must be "sufficiently severe or pervasive . . . and must be adequately connected to each other . . . as opposed to being an array of unrelated discriminatory or retaliatory acts" they are sufficient to constitute a hostile work environment claim.  *Baird*, 662 F.3d at 1252 (internal quotations omitted); *see also Morgan*, 536 U.S. at 120 (finding discrete acts to form "one actionable hostile work environment claim" where they "involve[d] the same type of employment actions, occur[ed] relatively frequently, and [were] perpetrated by the same managers.") (cleaned up); *Allen v. Mnuchin*, No. 18-cv-1214, 2019 WL 2581323, at *7 (D.D.C. June 24, 2019) (same).

In the present case, the Court finds that the various alleged acts of discrimination and retaliation against Mr. Moore are sufficiently connected to avoid the D.C. Circuit's concern over unrelated discrete acts.  Mr. Moore posits that the multitude of incidents alleged share "[t]he common threads" of being actions orchestrated by Dr. Hasier to exploit Mr. Moore's disability and make his "work environment more painful and physically uncomfortable" while also removing work that he could perform on telework.  Pl.'s Opp'n at 35.  There is evidence that Dr. Hasier committed or was involved in some way in almost all of the alleged incidents, which could allow a reasonable trier of fact to conclude that the incidents are sufficiently linked to form one coherent hostile work environment.  *See e.g., Thomas,* 412 F. Supp. 3d at 91 (finding discrete act of demotion to be part of same hostile work environment where all acts at issue were committed by the same supervisor).  Consequently, the Court finds the incidents in question to have a sufficient connection for this claim to proceed.

*b.  A Reasonable Juror Could Conclude Mr. Moore Was Subjected to Sufficiently Severe or Pervasive Abusive Conduct to Alter the Conditions of His Employment*

In order to demonstrate a hostile work environment, a plaintiff must show that "his employer subjected him to discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment."  *Baloch*, 550 F.3d at 1201 (internal quotation omitted).  In assessing the severity or pervasiveness of the behavior Mr. Moore alleges he endured, the Court must review the allegations as a whole and view the alleged acts in the light most supportive to his claim.  *Id*.  It also must objectively examine "the totality of the circumstances, including 'the frequency of the discriminatory [or retaliatory] conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an

employee's work performance.'"  *Whorton v. Wash. Metro. Area Transit Auth.*, 924 F. Supp. 2d 334, 353 (D.D.C. 2013) (quoting *Harris*, 510 U.S. at 23).

The Library argues that Mr. Moore's hostile work environment claim must be dismissed because he has failed to establish that the behavior inflicted upon him was sufficiently severe or pervasive to alter the conditions of his employment.  The Court disagrees.  Mr. Moore alleges a series of escalating harassment against him that caused him physical pain and suffering and also operated to thwart any attempts by Mr. Moore to stop the abuse.  To whit—first he had his telework plan revoked, exacerbating the painful symptoms of his disability, and was then assigned to a detail at the Reference Desk despite making it clear to Dr. Hasier that the job requirements of the assignment would cause him serious physical pain.  He was then issued a counseling memorandum for "unprofessional conduct" because he objected to said assignment, and was also denied the full amount of his requested advanced sick leave he sought to deal with his increased pain on the job.  And after Mr. Moore tried to again obtain a telework accommodation by going through the formal ADA process, his accommodation request was rejected for changing and perhaps pretextual reasons, and he was assigned to an extra day of Reference Desk coverage in what could be viewed as punishment for even trying to engage in the ADA interactive process at all.  Meanwhile, he also had his prestigious work duties—many of which could be completed while teleworking from home and thus could serve to justify his accommodation request—reduced or eliminated, was denied potential promotions to the temporary, acting, and permanent Head of Reference and Reader Services positions, and then when he attempted to escape to another division, was blocked from full participation in a select detail to another section of the Library.  If all of these allegations are true, a reasonable jury could conclude that Mr. Moore was subjected to a hostile work environment.  A reasonable juror

could find that these actions—many of which seem designed to cause Mr. Moore physical pain by exacerbating his chronic lymphedema and then to deny him access to any mitigating measures—invariably altered the terms and conditions of his employment. *See e.g.*, *Marshall v. Fed. Express Corp.*, 130 F.3d 1095, 1099 (D.C. Cir. 1997) ("We assume without deciding that if working conditions inflict pain or hardship on a disabled employee . . . [this] might be viewed as the ADA equivalent of the hostile working environment claim cognizable under other discrimination laws."). Such a situation would necessarily have unreasonably interfered with Mr. Moore's work performance by forcing him to work in new conditions and perform new duties that caused him physical pain. Consequently, the actions of Dr. Hasier and other Library staff appear sufficiently severe and abusive to have constituted a hostile work environment.

Moreover, a hostile work environment can also be found premised on the denial of Mr. Moore's accommodation request when considered in conjunction with the other incidents detailed above. This Court has in the past observed that a "denial of a reasonable accommodation can underlie a hostile work environment claim," when "all the circumstances" support such a claim. *Floyd*, 85 F. Supp. 3d at 517 (internal quotation marks omitted). The necessary other "circumstances"—typically some sort of other abusive behavior targeted at the plaintiff— are present here. In *Pantazes v. Jackson*, this evidence was found through actions taken by an agency to frustrate a plaintiff's efforts to secure reasonable accommodations along with statements made by agency officials "suggest[ing] a discriminatory purpose." 366 F. Supp. 2d 57, 71 (D.D.C. 2005). As in *Pantazes*, Dr. Hasier is alleged to have worked in bad faith to frustrate Mr. Moore's ongoing efforts to secure his telework accommodation. Indeed, at every turn either she or another Library official seemed to throw up road blocks to prevent Mr. Moore's success, ranging from contradicting the March 1 HSO Memo to find an insufficient

32

medical need for his requested accommodation to falsely playing up the unsuitability of his position for telework.  This evidence, considered along with the numerous other actions taken against Mr. Moore detailed above, could support a jury finding of a hostile work environment centered on the denial of a reasonable accommodation and related work actions against Mr. Moore.

In arguing for summary judgment and dismissal of this claim, the Library emphasizes that courts in the D.C. Circuit have generally declined to find a hostile work environment based on work related actions by supervisors.  *See e.g., Nurriddin v. Bolden*, 674 F. Supp. 2d 64, 94 (D.D.C. 2009) ("[T]he removal of important assignments, lowered performance evaluations, and close scrutiny of assignments by management [cannot] be characterized as sufficiently intimidating or offensive in an ordinary workplace context."); *Houston v. SecTek, Inc.,* 680 F. Supp. 2d 215, 225 (D.D.C. 2010), *aff'd*, 407 F. App'x 490 (D.C. Cir. 2011) ("Allegations of undesirable job assignments or modified job functions" was not enough to establish a work environment "permeated with discriminatory intimidation, ridicule, and insult."); *Allen v. Napolitano*, 774 F. Supp. 2d 186, 204–06 (D.D.C. 2011) (non-selection for a position coupled with denial of training opportunities amounted to typical employment grievances insufficiently severe or pervasive to support a hostile work environment claim). While the Court does not dispute this general principle, the totality of the circumstances here shows that the incidents in question created a far more extreme work environment in that it appeared designed to inflict pain and suffering on Mr. Moore by exacerbating his disability.  This is quite different from simply ordering an undesirable job assignment or changing an employee's job duties.  *See Marshall*, 130 F.3d at 1099 (implying in dicta that a hostile work environment could result where "working conditions inflict pain or hardship on a disabled employee"); *see also Faragher*, 524 U.S. at

787–88 (directing district courts to assess if the alleged work environment involved "physically threatening" acts that "interferes with an employee's work performance."). Consequently, the Court finds the Library's argument to be without merit.[12]

In sum, a reasonable jury could view the allegations at issue to show an increasingly aggressive set of targeted actions against Mr. Moore—seemingly designed to tighten the screws against him at every stage and undermine his ability to perform his job by subjecting him to physical pain and discomfort. Such actions, if true, would allow a reasonable jury to find that Mr. Moore's workplace was permeated with discriminatory conduct that was sufficiently severe to alter the terms and conditions of his employment. Accordingly, the Court denies the Library's motion for summary judgment with respect to Mr. Moore's hostile work environment claim.

### C. Mr. Moore's Non-Selection for Library Promotions

Mr. Moore also asserts that the Library, in an act of discrimination and/or retaliation, passed him over for positions that he was the best candidate for and that would have advanced his career. *See* Compl. ¶¶ 68–74. In response, the Library contends that it has asserted legitimate, non-retaliatory reasons for Mr. Moore's non-selection, and argues that because Mr. Moore cannot show that the Library's asserted rationale was a pretext for discrimination or

---

[12] Some of the incidents alleged by Mr. Moore in support of his hostile work environment claim—consisting primarily of derogatory or critical comments made to him by Dr. Hasier— are not sufficiently severe or pervasive to meet the required standard and instead amount to the kinds of non-actionable ordinary tribulations of the workplace. *See Richard v. Bell Atlantic Corp.*, 209 F. Supp. 2d 23, 35 (D.D.C. 2002) ("[R]ude comments, unjust criticism, and stressful working conditions, amount to ordinary tribulations of the workplace that [are] insufficient as a matter of law for a hostile environment case."); *Boone v. MountainMade Foundation*, 64 F. Supp. 3d 216, 241 (D.D.C. 2014) ("[P]laintiff must show far more than . . . criticisms[] and snubs or perceived slights to establish a hostile work environment."). However, even without the evidentiary support of these incidents, the other behavior alleged by Mr. Moore is sufficient to establish a hostile work environment such as to survive summary judgment.

retaliation, summary judgment is proper.  Def.'s MSJ at 33–37.  The Court is not convinced, and

for the reasons detailed below, finds that sufficient disputes of material facts exist such that

summary judgment cannot be granted.

### 1.  Legal Standard

The ADA prohibits employers from discriminating on the basis of disability, and both the

ADA and Title VII prohibit employers from retaliating against employees who engage in activity

protected under either statute.  *See* 42 U.S.C. § 12203(a); 42 U.S.C. § 2000e-3(a).  Typically,

these types of claims are all analyzed under the three-step *McDonnell Douglas* burden-shifting

framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), which was

originally used in the context of Title VII claims.  *See also Smith v. District of Columbia*, 430

F.3d 450, 455 (D.C. Cir. 2005) (applying *McDonnell Douglas* framework to ADA claims).

Under this framework, a plaintiff must first establish a prima facie case of retaliation or

discrimination, after which the burden of production then shifts to the employer to produce a

legitimate, non-retaliatory and/or nondiscriminatory reason for its action.  *McDonnell Douglas*,

411 U.S. at 802–04.  When an employer has done so, the burden shifts back again to the plaintiff

to demonstrate that the offered non-discriminatory or non-retaliatory reason was in actuality a

pretext for a prohibited discriminatory or retaliatory act.  *Id.*; *see also Johnson v. Interstate*

*Mgmt. Co., LLC*, 849 F.3d 1093, 1099 (D.C. Cir. 2017).

The D.C. Circuit has recognized that when an employer moves for summary judgment in

employment discrimination suits such as this one, "the employer ordinarily will have asserted a

legitimate, non-discriminatory reason for the challenged decision."  *Brady v. Off. of Sergeant at*

*Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008).  When this is the case, "the district court need not—

*and should not*—decide whether the plaintiff actually made out a prima facie case under

*McDonnell Douglas*." *Id.* (emphasis in original).  Rather, "the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on [a prohibited basis]"?  *Id.*  In short, a court must determine if the plaintiff has demonstrated that the employer's proffered reasons are pretextual.

An employee can produce such evidence "either directly by showing that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009) (brackets and internal quotation marks omitted) (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983)).  But a plaintiff must do more than "simply criticiz[e] the [defendant]'s decisionmaking process." *Hairston v. Vance-Cooks*, 773 F.3d 266, 272 (D.C. Cir. 2014).  "The plaintiff must identify evidence from which a reasonable jury could find that the [defendant]'s stated reasons were 'phony.'" *Moeller v. LaFleur*, 246 F. Supp. 3d 130, 140 (D.D.C. 2017) (quoting *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996).  In addition, "[t]he evidence of record must be such that a reasonable jury could not only disbelieve the employer's reasons, but conclude that the real reason the employer took a challenged action was a prohibited one." *Walker v. Johnson,* 798 F.3d 1085, 1093 (D.C. Cir. 2015).  This can be shown through, *inter alia*, an employer's "inconsistent or dishonest explanations, its deviation from established procedures or criteria . . . or other relevant evidence that a jury could reasonably conclude evinces an illicit motive." *Geter v. United States Gov't Publ'g Off.*, 436 F. Supp. 3d 227, 237 (D.D.C. 2020) (citing *Walker*, 798 F.3d at 1092)).

2. Analysis

The Library argues that summary judgment should be granted because it had legitimate, nondiscriminatory reasons for not selecting Mr. Moore for the temporary, acting, and permanent Head of Reference and Reader Services role.  Def.'s MSJ at 33.  Namely, it posits that the candidates chosen for both the temporary and permanent Head of Reference and Reader Services position were better qualified that Mr. Moore, and that in the interim period before this position was permanently filled, procedural restrictions required the Library to appoint an acting head instead of opening it up to another competitive detail process to which Mr. Moore could apply. *Id.*; Def.'s Reply at 25.  The Library contends that Mr. Moore cannot show that these reasons were pretext for discrimination or retaliation against him.  The Court examines each non-selection claim in turn.

*a. The Temporary Detail to the Head of Reference and Reader Services*

The first non-selection claim Mr. Moore brings regards his non-selection in December 2018 for a temporary promotion to the Head of Reference and Reader Services role, a position that Dr. Hasier instead selected Ms. Stillo to fill, according to the Library, due to her superior supervisory experience.  Def.'s MSJ at 34.  The Library argues that Mr. Moore cannot overcome this legitimate, non-discriminatory reason for passing Mr. Moore over for this position by showing pretext.  *Id.* at 35–37.  Mr. Moore disagrees, arguing first that the Library's rationale for selecting Ms. Stillo was not a legitimate one, and also arguing in the alternative that a reasonable jury could conclude the stated rationale by the Library was mere pretext to cover a discriminatory or retaliatory act.  Pl.'s Opp'n at 32–38.  The Court addresses both claims and finds that while the Library's proffered reason for Mr. Moore's non-selection is legitimate, Mr.

Moore has produced sufficient evidence to show pretext.  Accordingly, summary judgment on this claim must be denied.

    a. <u>The Library Offers a Legitimate, Non-Discriminatory Reason for the Non-Selection of Mr. Moore to the Temporary Head of Reference and Reader Services Detail</u>

The Library provides that Ms. Stillo was selected as the temporary head of Reference and Reader Services instead of Mr. Moore for the legitimate, non-discriminatory reason that "she had the most supervisory experience of all the applicants."  Def.'s MSJ at 34.  It was this factor that Dr. Hasier, the individual responsible for making the final selection, claimed was the most critical skill sought in the selection process.  *Id.*; *see also* Def.'s Ex. 6 at 193.  In support of this claim, the Library points to Ms. Stillo's supervisory experience gained through her "distinguished academic career," *id.*, which includes her experience as the Visiting Mellon Professor of Digital History at Washington and Lee University.  This supervisory experience consisted of supervising students on digital projects, which "included managing team work, work flows and meeting deadlines."  *Id.*; Def.'s Ex. 40; Def.'s Ex. 41.  Ms. Stillo's resume also boasts experience in rare books, digital scholarship, and reference services.  Def.'s Ex. 41.

Mr. Moore disputes that the Library's proffered reason for his non-selection is legitimate, arguing that the Library relies on inadmissible evidence and the rationale is impermissibly vague, rendering the Library unable to meet its burden at this stage of the analysis.  Pl.'s Opp'n at 33–34.  In making this argument, however, Mr. Moore seems to misunderstand just what is required of a defendant at this stage of the *McDonnell Douglas* analysis.  At the second prong of the *McDonnell Douglas* framework, an employer must sufficiently substantiate its proffered nondiscriminatory justification for an adverse employment decision.  *See Figueroa v. Pompeo*, 923 F.3d 1078, 1087 (D.C. Cir. 2019).  The D.C. Circuit has set out four primary factors that

must be met for a justification to be sufficiently substantiated.  *Id.*  These factors include: (1) "the employer must produce evidence that a factfinder may consider at trial;" (2)  the factfinder, "believ[ing] the evidence, must reasonably be able to find that the employer's action was motivated by a nondiscriminatory reason;" (3) the reason must be facially credible; and (4) the explanation must be "clear and reasonably specific."  *Id.* at 1087–88 (internal quotations omitted).

Mr. Moore takes issue with the Library's non-discriminatory reason under the first and fourth factors.  Citing the first factor, he argues that "the Library has a Rule 37 problem," insinuating that the Library's proffered reason for rejecting Mr. Moore's candidacy is based on inadmissible evidence.  Pl.'s Opp'n at 33.  But a review of the Library's reasoning and the evidence shows this assertion is incorrect.

Applicants for the temporary detail position were evaluated by Dr. Hasier based on the Knowledge, Skills and Abilities ("KSAs") standards that have since been produced by the Library.  And at her deposition, Dr. Hasier testified that she was given specific weights to attach to each factor from the Library's Human Capital Directorate, with the most weight to be awarded to supervisory experience.  Hasier Tr. 193:1-2 ("the most crucial KSA for this position was supervisory experience").  Mr. Moore takes issue with the fact that the document detailing the specific weight to be afforded to each KSA factor was not produced in discovery, arguing that as a result this information must be found to be inadmissible under the Federal Rules.  Pl.'s Opp'n at 33.  This argument lacks merit.  The Library can rely on Dr. Hasier's testimony to support its justification that supervisory experience was to be afforded the most weight in selecting amongst the applicants.  Accordingly, the first factor has been met.  Furthermore, if Mr. Moore believed

there to be a deficiency in the Library's discovery productions, he had ample time to raise this issue following Dr. Hasier's deposition prior to the close of discovery.

Mr. Moore also attacks the legitimacy of the Library's justification under the fourth factor by claiming its purported rationale for its hiring decision "lacks any specificity whatsoever."  Pl.'s Opp'n at 33.  To support this argument, Mr. Moore cites only the Library's official explanation as included in its interrogatory response for Mr. Moore's non-selection, which reads, "Mr. Moore's resume, like all candidates, was reviewed against the knowledge, skills and abilities (KSAs) for the position, and Ms. Hasier determined that Mr. Moore did not best satisfy the KSAs identified for the position."  Pl.'s SMF ¶ 192 (citing Pl.'s Ex. 112 (Response to Int. 9)).  This cherry-picked quote may indeed be vague, but this is just one of the several pieces of evidence provided by the Library.  Appropriate specificity can be found in Dr. Hasier's deposition testimony, which states that Ms. Stillo was selected based on her superior supervisory experience, which was the KSA factor Dr. Haiser was told to prioritize by the Human Capital Directorate.  Hasier Tr. 193:1-2; 194:8-11; 195:17-19.  This is a suitably specific reason to pass muster under this factor.  *Cf. Figueroa,* 923 F.3d at 1089 (noting that at the second prong an employer need only "articulate specific reasons for that applicant's qualifications such as 'seniority, length of service in the same position, personal characteristics, general education, technical training, experience in comparable work or any combination' of such criteria.") (citing *Steger v. Gen. Elec. Co.,* 318 F.3d 1066, 1076 (11th Cir. 2003)).

Because the Library has provided a legitimate, non-discriminatory reason for the non-selection of Mr. Moore for the temporary detail as the Head of Reference and Reader Services, the Court will proceed to the next stage of the inquiry.

b. <u>Mr. Moore Has Demonstrated That a Reasonable Jury Could Conclude That the Library's</u>

<u>Reasons for His Non-Selection for the Head of Reference and Reader Services Detail Were a</u>

<u>Pretext for Discrimination</u>

The Court turns now to the "central inquiry"— can Mr. Moore show that a reasonable

jury could find that the Library's asserted non-discriminatory reason for Mr. Moore's non-

selection was not the actual reason and that the Library intentionally discriminated against him

on a prohibited basis? *See Adeyemi v. District of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir.

2009). Based on a review of all of the available evidence, including comparative qualifications

information and potential flaws within the Library's selection process, the Court answers this

question in the affirmative.

Mr. Moore begins his attack on the Library's selection process by arguing that "a jury

could conclude that Mr. Moore had significantly better qualifications" than Ms. Stillo, the

individual ultimately chosen by Dr. Hasier for the temporary detail. Pl.'s Opp'n at 37.

Interpreting the evidence in the record in the light most favorable to Mr. Moore, a reasonable

juror could agree with this assessment. Focusing first on each candidate's supervisory

experience: Mr. Moore boasts four years of experience as a lead librarian with the Cleveland

Library, were he operated as the "lead staff member" managing the rest of the library staff when

the Head Librarian was out. Pl.'s SMF 190.[13] While serving as a Cartographic Specialist at the

Library, he also directed and supervised volunteers, junior fellows, library science practicum

students and library technicians. *Id*. Turning to his familiarity with the division, Mr. Moore had

---

[13] The Library argues that because Mr. Moore's deposition testimony did not state that his responsibilities at the Cleveland Library involved supervising staff, the Court should not credit this evidence. Def.'s Reply at 19. However, this experience was clearly listed on Mr. Moore's resume that was attached to his job application for this position, Pl.'s Ex. 2 at LC–2630, and consequently can be credited.

ten years of experience working in the Geography and Map Division, was "deeply knowledgeable" about the scholarship and research the division conducted, and maintained a close relationship with two of the significant outside groups that supported the division. *Id.* ¶ 189.  He also had nine months of experience providing reference services.  *Id.*  In contrast, Ms. Stillo's supervisory experience stemmed only from her short stint as a professor and consisted of supervising students, not library staff, and she did not have Mr. Moore's familiarity with the Geography and Map collection or the Reading Room.  *Id.* ¶ 180.

The Library takes pains to emphasize that a disparity in qualifications, standing alone, can support an inference of discrimination only when the plaintiff is "markedly more qualified," "substantially more qualified," or "significantly better qualified" than the successful candidate. *Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006) (internal quotation marks omitted).  This standard keeps the district courts from operating as a "super-personnel department that reexamines an entity's business decisions." *Fischbach*, 86 F.3d at 1183 (quoting *Dale v. Chi. Trib. Co.*, 797 F.2d 458, 464 (7th Cir. 1986).  But contrary to the Library's assertions, this rule does not end the inquiry.  For "even if [the qualifications gap] alone is insufficient, a reasonable jury, considering [the plaintiff's] stronger qualifications together with 'other flaws in the employer's explanation' could still reach a verdict in the plaintiff's favor." *Holcomb*, 433 F.3d at 897.  And Mr. Moore has identified a number of potentially problematic issues with the Library's selection process.

Mr. Moore first raises concerns about the impartiality of the Library's decisionmaker, Dr. Hasier.  Mr. Moore points to a number of incidents that he argues demonstrates that at the time Dr. Hasier made the selection she harbored a discriminatory bias against him.  For instance, as of January 2018 when this promotion decision was made, Dr. Hasier had within the past ten

months: loudly yelled at Mr. Moore for sending her an email alerting her to potential discrimination within the division, withdrawn Mr. Moore's telework accommodation, assigned him to the Reference Desk over his strenuous objections while telling him to "get ready to change your life," disciplined him with a counseling memorandum for his purportedly unprofessional reaction to this staffing, rejected his formal request for a medically based telework accommodation, acted in bad faith during the interactive process, reduced his sick leave request, and reduced his prestigious duties, among other incidents.  When a reasonable juror can conclude that the decisionmaker behind a non-selection "harbored a discriminatory bias against [the plaintiff], [they] could certainly conclude that [the supervisor's] scores in the interview were artificially deflated on account of that bias."  *Iyoha v. Architect of the Capitol*, 927 F.3d 561, 569 (D.C. Cir. 2019); *see also Forman v. Small*, 271 F.3d 285, 293 (D.C. Cir. 2001) ("When decision makers, or those who have input into the decision, express such discriminatory feelings around the relevant time in regard to the adverse employment action complained of, 'then it may be possible to infer that the decisionmakers were influenced by those feelings in making their decisions.'") (quoting *Hunt v. City of Markham*, 219 F.3d 649, 653 (7th Cir. 2000)).  The Court concludes that such an inference regarding Dr. Hasier's lack of neutrality is permissible here.

And the evidence shows that Dr. Hasier had the ability to manipulate the selection process.  This is because the evaluation scheme used to rank candidates relied almost entirely on the subjective judgment of Dr. Hasier alone.  There also is a lack of *any* contemporaneous documentation to support Dr. Hasier's account of an impartial evaluation process.  To summarize:  although the selection process was originally designed to include an interview component, Pl.'s Ex. 109 at LC 2512 (detail announcement stating that the top qualified candidates would be interviewed), Dr. Hasier decided to make the final selection based only on

the candidates' written applications and cover letters.  During her deposition she described her methodology for ranking the applicants.  First, she took the KSA factors provided by the Human Capital Directorate and then determined how well each candidate met each KSA factor.  Hasier Tr. 194:12-195:3.  Second, because the Human Capital Directorate also assigned a weight for each KSA factor—weighing more heavily the "critical" skills for the position— Dr. Hasier testified that she incorporated this into her final determination and prioritized candidates with supervisory experience.  *Id.* at 194:8–11.  Dr. Hasier's methodology was inherently subjective— for example, while both Mr. Moore and Ms. Stillo cited to their own supervisory experience, Dr. Hasier chose to credit more highly the supervisory experience held by Ms. Stillo, which consisted almost entirely of managing students, over Mr. Moore's supervisory experience at the Cleveland Library managing other librarians.  With good reason, courts are often skeptical of subjective evaluation determinations, given that they can serve as cover for impermissible discrimination.  *See Aka*, 156 F.3d at 1298 ("Although employers may of course take subjective considerations into account in their employment decisions, courts traditionally treat explanations that rely heavily on subjective considerations with caution" due to their ability to "mask or camouflage discrimination").  This concern is exacerbated due to Dr. Hasier's history of animus against Mr. Moore, along with the fact that Dr. Hasier did not employ any standardized or objective measures in her evaluation process, such as a numerical grading system.  Hasier Tr. 195:17–19.  Indeed, Dr. Hasier did not keep any documentation of her process at all.  *See id.* at 197:2–8 (indicating that she made her determinations "in [her] head.").  Where there is no contemporaneous documentation of an employer's proffered explanation for a non-selection, it "c[an] lead a reasonable jury to doubt the [defendant's] explanation."  *Hamilton v. Geithner,* 666 F.3d 1344, 1356 (D.C. Cir. 2012).  For "[c]ourts' skepticism of subjective factors is particularly

strong when an employer has not demonstrated that it relied on those factors at the time of the

relevant hiring decision." *Markowicz v. Nielsen*, 316 F. Supp. 3d 178, 199–200 (D.D.C. 2018).

Furthermore, in the face of a complete lack of contemporaneous documentation to

support Dr. Hasier's purported rationale for the hiring decision, the only contemporaneous

documentation that does exist does not exactly support the Library's justification for hiring Ms.

Stillo over Mr. Moore.  On January 31, 2018, shortly after Dr. Hasier made her selection, she

circulated an email to the Geography and Map Division announcing the hire and introducing Ms.

Stillo.  The email focused on Ms. Stillo's experience in rare books and digital scholarship, along

with her academic experience.  Pl.'s SMF ¶ 195 (citing Pl.'s Ex. 32 at LC 2486).  It makes no

mention of her supervisory experience.  *Id.*  "In a jury's eyes, this omission [of a proffered reason

from documents contemporaneous with the employment decision] might also count as evidence

that [the employer's] account of the interview was invented after the fact."  *See Aka*, 156 F.3d at

1299.  While admittedly this is far from the most conclusive evidentiary support, it does make

more plausible Mr. Moore's argument that the Library's provided explanation was pretext for

discrimination.[14]

_____

[14] Mr. Moore also raises the argument that Dr. Hasier "pre-selected" Ms. Stillo for the
detail.  Pl.'s Opp'n at 35.  However, the evidence Mr. Moore cites to support this claim falls
short of convincing.  He points to an email sent from Ms. Stillo to Dr. Hasier in which Ms. Stillo
inquired if she could apply to the detail even though she had a competing work commitment in
March, and Dr. Hasier replied "if the right candidate who is chosen for the position has some
commitment to an ongoing project in their old division I would imagine that could be part of the
discussion prior to the details' inception."  Pl.'s SMF ¶ 183 (citing Pl.'s Ex. 33 at LC 2682).  Dr.
Hasier's neutral response, coupled with the fact that it was Ms. Stillo, not Dr. Hasier who
initiated the communication, does not support Mr. Moore's claim that this was an act of pre-
selection for the role.  Similarly, Mr. Moore's contention that Dr. Hasier favored Ms. Stillo and
prompted her to submit a revised application emphasizing her supervisory experience (which
appears to hinge wholly on the fact that Ms. Stillo submitted a revised application using the word
"the" in connection with it) is simply unsupported conjecture.  Pl.'s Opp'n at 36.  But even
without this evidence, a reasonable juror could conclude that the Library's offered explanation
was pretext for discrimination.

Taking all of this evidence into consideration, the Court believes that the evidence of a disparity in qualifications between Mr. Moore and Ms. Stillo, the subjective nature of the Library's provided non-discriminatory explanation, and the absence of supporting contemporaneous documents could lead a reasonable jury to reach a verdict in Mr. Moore's favor. Because these issues raise questions of fact, they must be resolved by a jury that can take into account live testimony and make an assessment of witness credibility to determine this issue. Consequently, summary judgment on this claim is denied.

   b. *The Permanent Selection to the Head of Reference and Reader Services Section*

The second non-selection claim brought by Mr. Moore concerns his non-selection in May 2018 for the permanent Head of Reference and Reader Services position. A three-person selection panel, upon which Dr. Hasier served and selected the other panelists, interviewed five finalists before ultimately awarding the position to Ms. Hart. Def.'s MSJ at 34. This decision was purportedly based on the panel's evaluation and her superior credentials. *Id*. The Library again argues that Mr. Moore cannot overcome this legitimate, non-discriminatory reason for declining to select Mr. Moore for this position by showing pretext. *Id*. Mr. Moore disagrees, claiming that Dr. Hasier's prominent role on the selection committee coupled with issues regarding the fairness of the interview process could cause a reasonable jury to find in his favor. Pl.'s Opp'n at 38–42. While a close call, an evaluation of this evidence, viewed in the light most favorable to Mr. Moore, shows that a reasonable jury could indeed decide in his favor and conclude the Library's proffered rationale was pretextual. Accordingly, summary judgment on this claim is also denied.

a.  The Library Offers a Legitimate, Non-Discriminatory Reason for the Non-Selection of Mr.
Moore to the Permanent Head of Reference and Reader Services Position

Returning to the same framework, the Court will again begin by asking whether the

Library "has asserted a legitimate, non-discriminatory reason" for the selection of Ms. Hart

instead of Mr. Moore for the permanent Head of Reference and Reader position.  *Brady*, 520

F.3d at 494.  This can be answered in the affirmative.

The Library has met its burden by offering the non-discriminatory explanation that Ms.

Hart was selected for the role in question because she was the most qualified candidate, as

evidenced by both her extensive credentials and interview score.  The Library posits that Mr.

Moore's "qualifications are no match for Ms. Hart," Def.'s MSJ at 34, citing her management of

an academic library for over ten years and her twenty years of experience working with

geographic materials, including serving as the coordinator for the Maps & GIS Library and

Curator of Maps at Rice University, acting as Head of the Map and GIS Library at Texas A&M

University Libraries, having been a Chair of ALA's Map and Geospatial Information Round

Table (MAGIRT), as well as a co-editor of the Journal of Map & Geography Libraries.  Def.'s

Ex. 44 ("Hart Welcome Email").  The Library also repeatedly emphasizes that Ms. Hart was the

top-rated applicant according to the judgment of all three selection officials on the interview

committee, as reflected in the rating process for candidates.  Def.'s Ex. 43 ("Interview

Evaluation").  Mr. Moore, in contrast, was one of two applicants who rated at the bottom of

those interviewed for the position.  *See* Interview Evaluation.  Because the Library's rationale is

"facially credible in light of the proffered evidence," the Court finds it to be legitimate.

*Figueroa*, 923 F.3d at 1088.  Mr. Moore also does not dispute that the Library has met its burden

at this stage.

**b.** <u>Mr. Moore Has Demonstrated that A Reasonable Jury Could Conclude That the Library's</u>

<u>Reasons for His Non-Selection for the Permanent Head of Reference and Reader Services</u>

<u>Position Were a Pretext for Discrimination</u>

Because the Library has put forth a well-supported set of legitimate reasons for the non-selection, the Court must now evaluate if Mr. Moore has "produced sufficient evidence for a reasonable jury to find that the employer's asserted nondiscriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee." *Brady*, 520 F.3d at 494. Mr. Moore succeeds at this task—though just barely— by offering evidence of Dr. Hasier's bias against him coupled with her prominent role on the interview committee, along with issues with the supposedly objective interview process. Based on all of these circumstances, a reasonable juror could conclude that the Library's proffered reason for the non-selection was pretextual. Accordingly, summary judgment is denied and this claim must proceed to trial.

The Court begins by reviewing the Library's primary argument against pretext here, and concludes that it is lacking. The Library contends that because Mr. Moore conceded in his deposition that "he was not even better qualified than Ms. Hart, let alone substantially better qualified," Def.'s Reply 31, it is entitled to summary judgment regardless of any other evidence Mr. Moore marshals to argue that the Library's rationale for his non-selection disguised a discriminatory or retaliatory motive. This argument is meritless for two reasons. First, Mr. Moore's deposition testimony makes no such admission. When asked if he believed that he was better qualified than Ms. Hart, Mr. Moore responded by noting that he believed that they "have different qualifications" and went on to describe his "more extensive background working in Geography and Maps materials, the collections, the customer service case" along with his

background working with rare materials.  Def.'s Ex. 2 Moore Tr. 184:5–24.  Second, the law of

this Circuit is clear.  A plaintiff "attacking a qualifications-based explanation is of course not

limited to comparing his qualifications against those of the successful candidate. The plaintiff

can instead seek to expose other flaws in the employer's explanation."  *Aka,* 156 F.3d at 1295.

Indeed, the D.C. Circuit has specifically repudiated the practice of district courts requiring a

plaintiff to establish that the plaintiff is significantly better qualified for the job to survive a

motion for summary judgment, and allows employees to rely on other evidence as well to bolster

their arguments.  *See Holcomb*, 433 F.3d at 897; *see also Markowicz*, 316 F. Supp. 3d at 196

(denying summary judgment where plaintiff relied on both comparative qualifications evidence

and evidence of "procedural irregularities in a highly subjective selection process.").  This is

precisely what Mr. Moore has done, by pointing out the potential flaws with the selection

process and interview ratings (as discussed in more detail below), in addition to identifying his

own qualifications for the position.  Accordingly, contrary to the Library's claim, it is simply

incorrect to assert that no reasonable jury could find in his favor on this issue.

Given the Court's already extensive recitation of the evidence that could cause a jury to

conclude Dr. Hasier held a discriminatory and/or retaliatory animus against Mr. Moore, *see*

*supra* Section C.2.a.b, it need not reiterate it again at length here.  Of particular note, however, is

that three months before the selection process for the permanent Head of Reference and Reader

Services position began, Dr. Hasier sent an email to her immediate supervisor informing her that

she felt Mr. Moore's meeting with the Equal Employment Opportunity office to challenge her

selection of Ms. Stillo to the temporary detail was "border[ing] on harassment as opposed to

constructive dialogue."  Pl.'s Ex. 115 at LC 2852.  At her deposition she clarified that at the time

she was looking for "any process in place for supervisors" to do "anything . . . about what I felt

was harassment." Pl.'s SMF ¶ 202 (citing Hasier Tr. at 189:11–12).  Viewed in the light most favorable to Mr. Moore, a jury could interpret this email as showing (and further strengthening in light of the other evidence) that Dr. Hasier harbored a retaliatory animus against Mr. Moore for his engagement in protected activity.  And the fact that this comment and many of the other actions preceded Mr. Moore's non-selection for this role by a few months does not preclude this inference, as evidence of animus such as this predating an adverse employment action can still be taken into account by a factfinder.  *See, e.g.*, *Morris v. McCarthy*, 825 F.3d 658, 670 (D.C. Cir. 2016) (discriminatory statements made years prior can support judgment); *Iyoha*, 927 F.3d at 569 (finding a statement "made just a few months prior" to a non-selection could be used to infer a supervisor held a discriminatory attitude toward the plaintiff).  Accordingly, a reasonable juror could conclude that Dr. Hasier harbored a discriminatory animus against Mr. Moore based on all of this circumstantial evidence.

The Library argues that this is not enough to show that the non-selection of Mr. Moore for the permanent Head Reference and Reader Services position was a discriminatory or retaliatory act, given that Dr. Hasier was just one member of the three-member panel that made the hiring decision, and the panel used an objective ratings process that gave Ms. Hart the highest scores and tied Mr. Moore for the lowest.  Def.'s Reply at 23–24.  But the existence of a selection panel and a numerical ratings system does not insulate the Library's decision from review.  For "when an employer seeks to rely on a 'fairly administered' process to justify an employment action, the process must in fact be fair." *Iyoha*, 927 F.3d at 570.  And "[a] selection process that relies on numerical scores given by a panel of interviewers is only as fair as the panelists who give the scores." *Id*; *see Stoe v. Barr*, 960 F.3d 627, 644 (D.C. Cir. 2020) ("It is well understood that assessments of interview performances and dubious scoring systems can be

used to cover up discriminatory hiring practices."). Mr. Moore has presented sufficient evidence that could lead a reasonable juror to conclude that the evaluation process was susceptible to manipulation to disfavor him.

The D.C. Circuit's determination in *Iyoha v. Architect of the Capitol* is instructive here. In *Iyoha*, the D.C. Circuit found that a reasonable jury could conclude that because an influential member of a selection panel had a known discriminatory animus toward the plaintiff, and because he was in a position to potentially influence the scores given by the other panelists, it became "difficult to rely on the other panelists' scores" and trust they were unbiased, leading the court to conclude that the plaintiff was not provided "a fairly administered selection process." *Iyoha,* 927 F.3d at 570 (internal quotation marks and citation omitted). Such concerns are pertinent here as well.

In *Iyoha*, the supervisor harboring animus against the plaintiff "was the most senior member of the panel, which may have given him more sway in their group discussions." *Id.* Similarly, Dr. Hasier both served on the panel and was responsible for selecting the other interview panelists, Lisa Masengale, a member of the Science and Technology and Business Division of the Library, and Grant Harris, a member of the Library's European Division. In addition to being the selecting member of the panel, Dr. Hasier was also responsible for creating the job vacancy posting, including making the determination as to which factors would be included as necessary qualifications for the position. Pl.'s SMF ¶ 220. Thus, it is reasonable to conclude that as both the selecting panel member and the individual with the most familiarity with the position, the other panelists would look to Dr. Hasier for her expertise in evaluating candidates. *See Stoe*, 960 F.3d at 645 ("Tillery was the only one on the panel who could claim close familiarity with the Division Director position, which of course would carry weight in

panel interactions."). If Dr. Hasier's bias led her to falsely suggest Mr. Moore's answers were weak, this could have impacted the scoring of the other panelists who may have relied on her familiarity with the position and relevant requirements for how to evaluate the candidates.

Mr. Moore also attempts to argue that the evidence shows one could infer that Dr. Hasier bad-mouthed him to the other panelists. Pl.'s Opp'n at 40. Even granting Mr. Moore every reasonable inference, as the Court must, the evidence on this point is far from overwhelming. Dr. Hasier testified that she did not discuss Mr. Moore or the other candidates with the other members of the panel. Hasier Tr. 275:21–22 ("Part of the process is the panelists don't discuss the individual applicants."). Mr. Moore contends this assertion is false, given that Dr. Hasier also testified that the panelists discussed which candidates to interview. *Id.* at 244:22–245:5. He then argues that because Dr. Hasier "already provided false testimony about her communications with the other panelists," a reasonable jury could conclude that Dr. Hasier *must* have spoken negatively to the other members of the panel about Mr. Moore. Pl.'s Opp'n at 40. The Court disagrees. A fair reading of the underlying transcript shows that Dr. Hasier's comments are not in tension. Dr. Hasier's first comment that she did not discuss candidates with the other panel members was made in the context of being asked if she had told the other panelists Mr. Moore was difficult to work with. This is not in contradiction with the fact that the panel discussed which applicants to interview.[15]

---

[15] Mr. Moore's other attempts to show that Dr. Hasier *must* have spoken ill of him to the other panelists similarly fall short of convincing. He attempts to catch her in another purported "falsehood" by referencing her deposition testimony during which she denied having said anything negative about Mr. Moore to others. Hasier Tr. 75:12–14; 275:5–9. Mr. Moore contrasts Dr. Hasier's previous assertion with testimony from Ms. Tran and Ms. Hart, both of whom he claims testified that Dr. Hasier had told them that he was a difficult employee. Pl.'s Opp'n at 38. However, a review of the underlying testimony is far from this cut-and-dry. Ms. Tran testified that she did not know how Dr. Hasier would describe Mr. Moore—implying that

However, even if Dr. Hasier did not explicitly speak negatively about Mr. Moore to the panel, a reasonable jury might conclude that the rest of the panel was able to infer her attitude toward him based on her behavior during his interview, and scored him accordingly.  *Cf. Steele v. Mattis*, 899 F.3d 943, 951 (D.C. Cir. 2018) (holding that discriminatory comments made by an employer who was not the final decisionmaker were relevant when that supervisor had made such comments in the "discussions" and "meeting" that resulted in an adverse employment action).  These actions included refusing to make eye contact with Mr. Moore throughout his interview, and declining to even look at Mr. Moore's StoryMap presentation aide.  Pl.'s Ex. 1 Moore Tr. 181:15–182:17 (testifying that Dr. Hasier "kept her head down" throughout Mr. Moore's interview).

Mr. Moore also puts forth evidence that during his interview he was treated differently than the other applicants and disputes the accuracy of the scores he received, adding additional support to the theory articulated above.  The Court will examine each alleged deficiency in turn.

In *Salazar*, the D.C. Circuit ruled that unexplained deviations from standard interview procedures could allow a factfinder to infer that an ostensibly fair selection process was instead pretext for discrimination.  *Salazar v. Wash. Metro. Transit Auth.*, 401 F.3d 504, 508 (D.C. Cir.

---

Dr. Hasier had never told her that Mr. Moore was difficult— but that Ms. Tran personally believed he was a difficult employee, and was under the impression Dr. Hasier felt the same. Tran Tr. at 237:21-238:13.  Ms. Hart testified that when she approached Dr. Hasier with questions about how to handle managing Mr. Moore, who Ms. Hart characterized as "overwhelming," Dr. Hasier "may have" made a statement to the effect of, "yes, he's a challenge."  Pl. Ex. 5 Hart Tr. 133:16-35:1.  Neither of these incidents describe Dr. Hasier affirmatively bad-mouthing Mr. Moore to other Library employees as Mr. Moore suggests, thus allowing an inference that Dr. Hasier must have done the same with the other members of the selection panel.  Mr. Moore also claims that Dr. Hasier told Mr. Sweeney that she did not want to work with Mr. Moore.  Pl.'s Opp'n at 40.  Mr. Sweeney's deposition testimony indicates otherwise.  *See* Pl. Ex. 14, Sweeney Tr. at 65:21-66:16 (testifying that Dr. Hasier and Mr. Moore "were working through communication issues" and noting he did not know if Dr. Hasier "liked" Mr. Moore).

2005).  It is undisputed that all of the applicants to the permanent Head of Reference and Reader Services position were to be asked the same set of primary and follow-up questions during their interviews.  *See* Def.'s Reply SMF ¶ 212.  However, Mr. Moore claims that he was "put on the spot" and asked an interview question (to explain his overall communication philosophy), that was not asked of the other applicants, as it was designed to be evaluated holistically based on the applicants' overall interview performance.  Pl.'s SMF ¶ 218.  Mr. Moore received lower marks on this measure than Ms. Hart, who was evaluated based on her overall communication skills from the entirety of the interview.  *Id.*  The panel went off-book again to ask Mr. Moore a question about his experience with Geospatial or GIS collections, even though this topic was not included in the scripted questions and experience in this regard was not a focus of the selection.  Pl.'s SMF ¶ 220.

Mr. Moore also takes issue with the scores he was awarded by the panel, raising questions regarding if the evaluation rubric was applied consistently.  To illustrate his concerns, he points to his score for KSA #3, "Knowledge of Integrated Library Systems, Library Applicants and other Information Technologies."  As Dr. Hasier explained at her deposition, in order to receive a perfect score of 4 for this question an applicant had to explain their use of all of six applications listed in the scoring guide.  Hasier Tr. 259:12–260:19.  In response to this question, Mr. Moore described his experience with all but one of the listed applications, along with four additional applications.  He was awarded a score of 3.  *See* Interview Evaluation.  In contrast, Ms. Hart mentioned only one of the listed applications and received a perfect score of 4 from each panelist.  Pl.'s SMF ¶ 215.  Mr. Moore argues the same process occurred for KSA #6, where again he met all of the requirements in order to be awarded an "outstanding" rating of 4, but Dr. Hasier scored him a 2, while the other panelists scored him a 2 and 3 respectively.  Pl.'s

SMF ¶¶ 216–217.  This type of dubious scoring has been recognized as a method of obfuscating discriminatory hiring.  *See, e.g.*, *Hamilton*, 666 F.3d at 1355–56; *Stoe*, 960 F.3d at 644.  Because the Court finds that the significance of these potential flaws with the Library's selection process turns on the credibility of the Library's selecting panel, a question that is "quintessentially one for the finder of fact," *Aka*, 156 F.3d at 1298–99, summary judgment is inappropriate.  In sum, because Mr. Moore has produced enough evidence that a reasonable jury could credit his version of events and conclude that his non-selection was in part a product of discrimination or retaliation, this claim must proceed to trial.

   *c. Temporary Assignment of Head of Reference and Reader Services Duties to Ms. Sayles*

   Turning to the last non-selection at issue, Mr. Moore contends that "after [Ms.] Stillo's detail ended, rather than open the position up for another competitive detail, [Dr.] Hasier appointed Renee Sayles to be the acting Head of the Reference Section until a new permanent Head could be hired and could begin working," in an act he asserts was made to yet again unfairly deprive him of the opportunity to serve in this position.  Pl.'s Opp'n at 37 (citing Pl.'s SMF ¶ 204).  The Library claims that the decision was actually made for the legitimate, non-discriminatory reason that Dr. Hasier believed—though incorrectly— that because Ms. Hart had already been selected in May of 2018 for the permanent Head of Reference and Reader Services post, the position was from that point forward encumbered, and another temporary detail could not be opened.  Hasier Tr. at 207:5–10 (explaining that if a position is encumbered, "even if the applicant is not onboarding . . . you can't fill against –two people can't pull the same position.").  As a result of this false understanding of the relevant human resources polices, Dr. Hasier consequently asked Ms. Sayles to serve as the acting head of the Reference Desk until Ms. Hart could assume the role.

Mr. Moore disputes the Library's account. His attention to this issue is admittedly brief—he dedicates just one paragraph in his opposition to the topic, Pl.'s Opp'n at 37–38, and while somewhat unclear, the Court interprets his argument to assert that Dr. Hasier's explanation for Ms. Sayles's appointment was pretextual.  Upon review of the record, the Court agrees, and will allow this claim to go to trial.

In arguing for pretext, Mr. Moore first claims that Ms. Sayles's "qualifications did not lend themselves to the Reference Section." *Id.*  The only support he provides for this assertion is a statement from Mr. Sweeney, who testified that he was unaware that Ms. Sayles was ever staffed in the reference section, due to her role as "head of a collection management section . . . [which are t]wo different things.  One manages collections, the other one interacts with people." Sweeney Tr. 145: 4–9.  However, when directly asked if Ms. Sayles was "not an obvious candidate for head of the Reading Room," Mr. Sweeney did not agree, simply reiterating that he "d[idn't] know what the rotation was for detail people." *Id.* at 145:10–22.  While a reasonable juror could perhaps conclude from this testimony that Ms. Sayles was a somewhat unusual choice to be acting head of the Reading Room given her background, standing alone, this would not provide enough support to conclude that Dr. Hasier's rationale was pretextual.  However, coupled with the second argument Mr. Moore provides—that Dr. Hasier's explanation was demonstratively false—as addressed below, pretext can be found.

Mr. Moore cites to Ms. Hart's Notification of Personnel Action form to claim that Dr. Hasier's argument that the position was encumbered was false.  Pl.'s Opp'n at 38; Pl.'s Ex. 37 at SF–50.  The form states that Ms. Hart's "effective date" was September 17, 2018, Pl.'s Ex. 37, three to four months after the May or June 2018 date that Dr. Hasier testified was the time at which the position became encumbered.  Hasier Tr. 207:13–15.  The Library has conceded that

the position was unencumbered at this time.  Def.'s SMF Resp. ¶ 206.  It follows, of course, that

if the position was unencumbered, Dr. Hasier could have opened it back up for another

temporary detail until Ms. Hart assumed the position full time.  And Dr. Hasier could reasonably

expect that Mr. Moore would apply for the position, given his previous application.  The Library

insists that the erroneous nature of Dr. Hasier's rationale cannot show impermissible

discrimination or retaliation, because she acted under a misunderstanding, and, relying on her

deposition testimony, asserts that she honestly believed the position was encumbered.  Def.'s

Reply at 25–26.  But a "factfinder is entitled to consider a party's dishonesty about a material

fact as affirmative evidence of guilt." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133

(2000) (internal quotation omitted).  Indeed, as the Supreme Court in *Reeves* pointed out, "once

the employer's justification has been eliminated, discrimination may well be the most likely

alternative explanation." *Id.* at 134.  The erroneous nature of Dr. Hasier's explanation is all the

more concerning in light of the abundance of other evidence in the record which points to Dr.

Hasier's possible animus toward Mr. Moore, including that Mr. Moore had previously reported

Dr. Hasier to the Equal Employment Opportunity office for her selection of Ms. Stillo to this

same position, in an act she later characterized as an act of harassment against her.

Consequently, considering this context along with the unusual choice of Ms. Sayles for the role

given her inapposite background, coupled with the erroneous nature of Dr. Hasier's purported

rationale for the staffing decision, a reasonable juror could conclude that the Library's proffered

nondiscriminatory reason for appointing an acting Head of Reference and Reader Services was

pretextual, rather than a good faith erroneous interpretation of the applicable human resource

policies.  Accordingly, this claim must proceed to trial.

## V.  CONCLUSION

For the foregoing reasons, Defendant's motion for partial summary judgment (ECF No.

22) is **DENIED**, Plaintiff's Motion for Leave to File Surreply (ECF No. 43) is **GRANTED,** and

Plaintiff's Surreply (ECF No. 43-1) shall be **DEEMED FILED**.  An order consistent with this

Memorandum Opinion is separately and contemporaneously issued.

Dated:  February 22, 2021                                          RUDOLPH CONTRERAS
                                                                          United States District Judge